UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X

CHARLES ROBERT II, a/k/a Snowflake 5391

Plaintiff,

-against-

THE CENTRAL INTELLIGENCE AGENCY and
THE DEPARTMENT OF JUSTICE

Defendant.

------------------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ **COMPLAINT** ★
DEC 31 2002

LONG ISLAND OFFICE

CV 02 6788

SEYBERT, J.

LINDSAY, M.

(S. I.)

## INTRODUCTION

1.  This is a Freedom of Information Act (FOIA) action in which the plaintiff, pro se, seeks the release of FOIA requested Central Intelligence Agency (CIA) documents, denominated as the "North Notebook" documents, which were identified by the National Archives in a prior FOIA seeking the release of the "FBI Agent Allison" documents, which were withheld pursuant to FOIA Exemption 3 in order to protect the CIA's "sources and methods" within the FBI, DOJ, Health and Human Services (HHS), and Social Security Administration (SSA), and which have the notations "Top Secret Codeword Working Papers" of the "April 22, 1985 North Notebook" regarding "IMC" with the code "AMX000620", "14096", and the "Call from Clarridge" . See Robert v. National Archives, 2001 WL 28277. See also Miami Mystery: Paid to Treat Elderly, IMC Moves in Worlds of Spying and Politics: Medicare Money Flowed in: Only Mr. Recarey Knows Where It Flowed Next: Congress, "bugs" and Mob. Wall Street Journal 8-8-1988.

2.  The plaintiff seeks a second set of Department of Justice (DOJ) documents, denominated as the "DOJ-CIA" documents, which were the DOJ documents generated in defending Robert v. CIA, cv 00-4325 (Seybert, J), and which map the contours of a flawed internal DOJ compartmentalized stove-piped decision making chain of command process in

which CIA assets, within the DOJ, _intentionally_ provide _inaccurate_ information to the Attorney General of the United States, in order that the AG will have a "plausible deniability" defense of _not_ knowing that CIA assets, within the DOJ, are making litigation decisions to protect the sources and methods of the CIA within the FBI, the Department of Health and Human Services (HHS), and the Social Security Administration (SSA), but which have resulted in the Attorney General of the United States losing "command and control" over DOJ litigation decisions which results in collateral damage to _millions_ of legally _defenseless_ aged, blind, and disabled citizens for whom the AG has an Article II, Section 3 Constitutional duty to "take Care that the Laws be faithfully executed."

3. The plaintiff seeks the release of these documents to prove to AG Ashcroft that the CIA assets within the DOJ, HHS, and SSA have determined to expand the nonacquiescence policy of former HHS General Counsel del Real to now include the unbridled expansion of Executive Branch power _not_ to acquiesce to the Supreme Court's _Christensen_ administrative law procedure decision whereby the "law" is based on duly promulgated regulations and not Executive Branch counsels' interpretations of federal regulations. "To defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation." _Christensen v. Harris County_, 120 S. Ct. 1655 (2000).

4. On October 12, 2001, Attorney General John Ashcroft issued a Memorandum to the heads of all departments and agencies that supersedes Attorney General Janet Reno's October 4, 1993 Memorandum and states the DOJ's commitment to full compliance with the FOIA as an important means of maintaining an open and accountable system of government, but balancing that commitment the privacy and secrecy needs of the government:

> As you know, the Department of Justice and this Administration are committed to full compliance with the Freedom of Information Act (FOIA), 5 U.S.C.§ 552 (2000). It is only through a well-informed citizenry

that the leaders of our nation remain accountable to the governed and the American people can be assured that neither fraud nor government waste is concealed.

The Department of Justice and this Administration are equally committed to protecting other fundamental values that are held by our society. Among them are safeguarding our national security, enhancing the effectiveness of our law enforcement agencies, protecting sensitive business information and, not least preserving personal privacy.

Our citizens have a strong interest as well in a government that is fully functional and efficient. Congress and the courts have long recognized that certain legal privileges ensure candid and complete agency deliberations without fear that they will be made public. Other privileges ensure that lawyers' deliberations and communications are kept private. No leader can operate effectively without confidential advice and counsel. Exemption 5 of the FOIA, 5 U.S.C. § 552 (b)(5), incorporates these privileges and the sound policies underlying them.

I encourage your agency to carefully consider the protections of all such values and interests when making disclosure determinations under the FOIA. Any discretionary decision by your agency to disclose information protected under the FOIA should be made only after full and deliberate consideration of the institutional, commercial, and personal privacy interests that could be implicated by disclosure of the information.

In making these decisions, you should consult with the Department of Justice's Office of Information and Privacy when significant FOIA issues arise, as well as with our Civil Division on FOIA litigation matters. When you carefully consider FOIA requests and decide to withhold records, in whole or in part, you can be assured that the Department of Justice will defend your decisions unless they lack a sound legal basis or present an unwarranted risk of adverse impact on the ability of other agencies to protect other important records.

This memorandum supercedes the Department of Justice's FOIA Memorandum of October 4, 1993, and it likewise creates no substantive or procedural right enforceable by law. Emphasis Added. WWW.usdoj.gov/oip.foiapost/2001foiapst19.htm.

5. Upon information and belief, pursuant to the defendants' counsels' interpretation of AG Ashcroft's October 21, 2001 FOIA guideline, the defendants' counsels have determined to use a classified information FOIA defense pursuant to the FOIA "(c) exclusion", 5 U.S.C. § 552 (c), whereby the requester is advised by the government FOIA Officer that no records

responsive to this FOIA request exist, even though responsive documents do exist. "While 'glomarization' remains adequate to provide necessary protection to certain situations, these special record exclusions should prove invaluable in addressing the exceptionally sensitive situations in which even 'glomarization' is inadequate to the task." DOJ Freedom of Information Act Guide & Privacy Act Overview, May 2000 Edition, at p. 455. See also Phillippi v. CIA, 546 F. 2d 1009 (D.C. Cir. 1976).

6. The plaintiff complains that as a result of the defendants' counsels' interpretation of 5 U.S.C. § 552 (c), the AG's October 21, FOIA guideline, and the USA PATRIOTS ACT, the CIA assets within the DOJ are now intentionally not providing the truth, the whole truth, and nothing but the truth to Attorney General Ashcroft in order that Attorney General Ashcroft will not have knowledge of the details of the implementation of CIA domestic "black operations" which has resulted in a breach of the FOIA legislative goal of providing United States citizens with the ability to learn how its Government works:

> A popular Government without popular information or the means of acquiring it, is but a Prologue to a Farce or a Tragedy or perhaps both. Knowledge will forever govern ignorance, and a people who mean to be their own Governors, must arm themselves with the power knowledge gives. —James Madison as quoted in A Citizen's Guide on Using the Freedom of Information Act of 1974 to Request Government Records. March 11, 1999, p. 2. Emphasis added.

7. The plaintiff also complains that as an intended consequence of the CIA assets implementation of their "denial and deception" litigation strategy to provide a "plausible deniability" defense for Attorney General Ashcroft in order to protect CIA sources and methods within the DOJ, FBI, HHS, and SSA, has resulted in the policy and practice of DOJ attorneys filing pleadings, signed pursuant to FRCP 11, who have actual knowledge that the pleadings they filed do not provide the truth, the whole truth, and nothing but the truth to federal court

judges, and that this "denial and deception" litigation strategy of DOJ attorneys has directly impacted on the remedy to cure the due process violations visited upon <u>millions</u> of legally defenseless aged, blind, and disabled members of the <u>Ford v. Apfel</u>, 87 F. Supp.2d 163 (E.D.N.Y. 1999), nationwide class, which is the toxic legacy of the clandestine implementation of the pre-June 3, 1985 nonacquiescence policy of former-HHS General Counsel Juan del Real from 1985-2002, that was to have ended on June 3, 1985 based on the sworn July 25, 1985 Congressional testimony of Acting SSA Commissioner Martha Mc Steen, DAAG Carolyn Kuhl, and SSA Chief Counsel Donald Gonya. <u>See</u> <u>City of New York v. Bowen</u>, 106 S. Ct. 2023 (1986), and the equitable tolling remedy that can be ordered to cure the implementation of a HHS clandestine policy.

8. Because of the gravity of plaintiff's allegations and the sensitive content of the FOIA requested documents, the plaintiff has made an ongoing offer of <u>settlement</u> to AG Ashcroft, whereby this action, and the pending FOIA actions <u>Robert III v. DOJ</u>, <u>Robert IV v. DOJ</u>, and <u>Robert III v. HHS</u> discussed below, would be <u>withdrawn</u>, if AG Ashcroft agrees to instruct HHS Secretary Thompson and SSA Commissioner Barnhart to implement the acquiescence policy as explained in the sworn July 25, 1985 Congressional testimony of Acting SSA Commissioner Martha Mc Steen, DAAG Carolyn Kuhl, and SSA Chief Counsel Donald Gonya, when they advised Members of Congress that the pre-June 3, 1985 nonacquiescence policy of former-HHS General Counsel del Real had ended on June 3, 1985.

9. This case is filed as a related case to <u>Robert v. CIA</u>, cv 00-4325, which Judge Seybert dismissed, without prejudice, in her July 16, 2001 Memorandum and Order because the plaintiff had failed to exhaust his administrative remedies.

## JURISDICTION

10.   Pursuant  to 5 U.S.C. § 552 (a)(4)(B) and § 552 (a)(6)(A) and (C), this Court has jurisdiction of complaints appealing the decisions by the CIA and the   Department of Justice to withhold the FOIA requested documents.

11. The defendant CIA's Agency Release Panel rendered a final decision on December 2, 2002.

12.   Pursuant to 50 U.S.C. § 432 (c), there is judicial review of a complainant's allegation that   the   CIA   Director   has   improperly   withheld   records   that   had   been   determined   to   be classified documents  for  more than 10 years ago.

13. The defendant DOJ's FOIA Officer Co-Director Richard Huff, who is authorized to make the final FOIA decisions on behalf of AG Ashcroft,   has not  rendered a Final decision, however, more than 30 days have passed since the filing of the "DOJ-CIA" FOIA request and all of plaintiff's  requests for a final decision have been "stonewalled" by the DOJ's Office of Information and Privacy.

## THE PARTIES

14.   The plaintiff is an attorney whose offices are at 100 Merrick Road Rockville Center, New York and who  represents aged, blind, and disabled clients whose benefits were denied or reduced because of the federal government's implementation of  the  nonacquiescence policy of HHS General Counsel del Real both before and after June 3, 1985, when,   as per the sworn July 25, 1985 Congressional testimony, Acting SSA Commissioner Mc Steen, DAAG Kuhl, and SSA Chief Counsel Gonya, the nonacquiescence policy of HHS General Counsel del Real  was to have ended on June 3, 1985. See   Glasgold-Ruppert v. Califano, 558 F. Supp. 129, 151  (E.D. N.Y. 1982),  aff'd sub. nom. Rothman v. Schweiker, 706 F. 2d 407  (2nd Cir. 1983), cert. den. sub. nom. Guigno v. Schweiker, 464 U.S. 984 (1983).   Ruppert v. Bowen, 671   F.Supp. 151

(E.D.N.Y. 1987), Ruppert v. Bowen, 871 F. 2d 1172 (2d Cir. 1989).   Gordon v. Shalala, 55 F. 3d 101 (2d Cir. 1995) cert. den. 517   U.S. 1103 (1996). Gartmann v.   HHS, 633 F. Supp. 671 (E.D.N.Y. 1996).  O'Keefe v. HHS, 643 F. Supp. 523 (E.D.N.Y. 1996).  Friedman v. Bowen, 819 F. 2d 42 (2d Cir. 1987). Hurley v. Bowen, 857 F. 2d 907 (2d Cir. 1987).  Mines v. HHS, cv 95- 3732 (Johnson, J).  Gokeler v. Shalala, cv 96-3557 (Johnson, J).

15.  The defendant  CENTRAL INTELLIGENCE AGENCY  (CIA) is the name of the agency that    pursuant to    50 U.S.C. § 403 (d) (3), "shall be responsible for protecting intelligence sources and methods from unauthorized disclosure."

16.  The defendant DEPARTMENT OF JUSTICE (DOJ)  is the name of the agency   that pursuant to FOIA requirements    is to be named as the    defendant when FOIA requested documents are withheld by the DOJ    FOIA Officer.

17. In the winter of 1984-1985, the DOJ denominated the plaintiff as "Snowflake 5391" when,  in tandem with HHS General Counsel Juan del Real, CIA assets, within HHS and DOJ, conducted a civil and criminal "Fraud Against the Government" investigation of Snowflake 5391 in order to eliminate plaintiff as an attorney because he was challenging the HHS General Counsel del Real's implementation of the his nonacquiescence policy which allowed HHS General Counsel del Real to divert    "unaudited pooled HHS nonacquiescence funds" for purposes not intended by the Congress and President Reagan.

18. The plaintiff filed a series of FOIA actions over the next  17 years seeking the release of a  mosaic of documents withheld by the Government  to prove that rogue  CIA assets within the HHS and DOJ had implemented a   sham 1984-1987 civil and criminal "Fraud Against  the Government" investigation of Snowflake 5391, initiated by HHS General Counsel Juan del Real, that violated    plaintiff's  Constitutional right to have access to the Courts  on behalf of his clients who challenged HHS General Counsel del Real's implementation of his  nonacquiescence

policy that had resulted in <u>millions</u> of legally <u>defenseless</u> United States citizens not receiving the benefits that Congress intended that they receive. <u>See</u> <u>Robert v. Holz,</u> cv 85-4325 (Wexler, J). <u>Robert v. Doe,</u> cv. 89-4039 (Wexler, J). <u>Robert v. Diefenderfer,</u> cv 90-3403 (Wexler, J). <u>Stone Counsel v. Bell,</u> cv 91-1257 (Spatt, J). <u>Ruppert Counsel I v. Bell,</u> cv 90-0881 (Wexler, J). <u>Ruppert Counsel II v. Messick,</u> cv 91-2105 (Wexler, J). <u>Ruppert Counsel III v. DOJ,</u> cv 95-1794 (Wexler, J). <u>Thierman-Ruppert Counsel IV v. DOJ,</u> cv 96-6157, a/k/a <u>Robert II v. DOJ</u> (Wexler, J). <u>Snowflake 5391a/k/a Charles Robert v. The National Archives, the DOJ, the HHS, and the SSA,</u> <u>Robert v. National Archives,</u> cv 98-3598 (Wexler, J), cv 98-3589, (Wexler, J). <u>Robert II v. DOJ,</u> CV-96-6157, (Wexler, J). <u>Robert I v DOJ,</u> cv 99-3649 (Mishler, J). <u>Robert v. HHS,</u> cv 98-3648 (Mishler, J). <u>Robert v. SSA,</u> cv 98-3650 (Wexler, J).

19. The plaintiff is also the plaintiff in the pending <u>Robert III v. DOJ,</u> cv 01-4198 (Gershon), which seeks the release of the universe of documents upon which FBI Director Judge Freeh determined <u>not</u> to extradite from Spain the fugitive International Medical Center, Inc. (IMC) President Miguel Recarey and in which the most honorable and courageous FBI Director Mueller used the "glomarization" defense, whereby the defendant neither admits nor denies the existence of FOIA requested documents, in order to protect the CIA's sources and methods within the DOJ, FBI, HHS, and SSA. <u>See</u> <u>Phillippi v. CIA,</u> 546 F. 2d 1009 (D.C. Cir. 1976).

20. The plaintiff is also the plaintiff in the pending <u>Robert IV v. DOJ,</u> cv 02-1101 (Garaufis, J), in which the plaintiff is seeking the release of a series of DOJ documents, including the "Charles Robert criminal investigative file" documents, the "Shaheen law enforcement" documents, and the "Ruppert", "Stone", and "Gordon" documents being withheld by DOJ FOIA Officers which contain "smoking gun" evidence that establish that Executive Branch officials, including CIA assets within the HHS and DOJ, violated Snowflake 5391's First Amendment right of access to the Courts by their participation in the sham "Fraud

Against the Government" investigation of Snowflake 5391 or in the subsequent "cover up" of Executive Branch attorneys' participation in the sham "Fraud Against the Government" investigation of Snowflake 5391.   See  Harbury v. Christopher, 122 S. Ct. 2171    (2002). Bartnicki v. Vopper,  121 S.Ct. . 1753  (2001).   New York State Bar Association v. Reno,  999 F. Supp. 710 (N.D.N.Y. 1999).

21. The plaintiff is also the plaintiff in the pending      Robert III v. HSS, cv- 01-6114 (Gleeson, J), in which the plaintiff is seeking the release of the universe of  documents upon which HHS Inspector General Richard Kusserow and then-FBI Director Judge William Webster terminated a mid-1980s joint FBI-DOJ-HHS task force that was investigating alleged "Fraud Upon the Government" committed by employees of    International Medical  Center, Inc., including IMC President Miguel Recarey, and the universe of 1987 documents upon which  HHS officials approved the use of a gun at a Gordon ALJ hearing to intimidate or eliminate Snowflake 5391.

22. The plaintiff in Robert II v. CIA,  Robert III v. DOJ, Robert IV v. DOJ, and Robert III v. HHS, alleges that the FOIA withheld documents, along with a mosaic of documents released in other FOIA actions,    contain "smoking gun" evidence which, if ever read by AG Ashcroft and Congressional Oversight Committees,  would prove to AG Ashcroft and the Congressional Oversight Committees  that DOJ attorneys had actual knowledge that the  sworn July 25, 1985 Congressional testimony of Acting SSA Commissioner Martha Mc Steen, DAAG Carolyn Kuhl, and SSA Chief Counsel Donald Gonya that the nonacquiescence policy of HHS General Counsel had ended on June 3, 1985,  had not been accurate sworn Congressional testimony  because HHS General Counsel del Real, who in 1986 would become IMC President Miguel Recarey's Chief of Staff, did not reprogram the HHS computer when "acquiescence" decisions were made in order that he could  divert  "unaudited pooled HHS nonacquiescence funds"  though

9

International Medical Center, Inc., and on to the contras as part of a rogue CIA domestic "black operation" that was in violation of the Boland Amendment, but which was conducted <u>without the knowledge of  President Reagan, Vice President Bush, AG Meese, FBI Director Webster, and HHS Secretaries Schweiker, Heckler, and Bowen</u>.

23. The plaintiff alleges that, almost incredibly,  the clandestine nonacquiescence policy of HHS General counsel del Real has continued to be implemented  unabated from 1985-2002 by disciples of HHS General Counsel del Real whereby the HHS and SSA computers have <u>intentionally</u> <u>not</u> been reprogrammed with the "acquiescence" standards that were to have been established as per the sworn July 25, 1985 Congressional testimony,  which has  caused   the reduction or termination of benefits to   <u>millions</u> of legally <u>defenseless</u> aged, blind, and disabled citizens benefits from 1985-2002 because  of the continued   clandestine  implementation of the pre-June 3, 1985 nonacquiescence policy of HHS General Counsel del Real after June 3, 1985, in order that the CIA assets within the DOJ,  HHS and SSA  could  continue to divert "unaudited pooled nonacquiescence funds" for other purposes not intended by the Congress or the President <u>without</u> the knowledge of the President or the Congress.

## FACTS AS TO THE  FOIA REQUESTED CIA "NORTH  NOTEBOOK" DOCUMENTS

24.  On March 29, 1989,  based on an  invitation from the staff of  Independent Counsel (IC) Lawrence Walsh, the plaintiff  was interviewed  within the Office of IC Walsh by FBI Agent Allison and Robert Lonsterth, Esq. regarding Snowflake 5391's  allegation, with accompanying documents that had been sent  to IC Walsh,   that   "unaudited pooled HHS nonacquiescence funds" had been diverted  through International Medical Center, Inc, and onto the contras  in violation of the Boland Amendment without the  knowledge of President Reagan  and the Congress.

25. At the termination of the March 29, 1989 interview, FBI Agent Allison advised the plaintiff that Independent Counsel Walsh would consider investigating the allegations.

26. FBI Agent Allison and Robert Lonsterth, Esq. left the March 29, 1989 interview with the documents that Snowflake 5391 had provided Independent Counsel Walsh and FBI Agent Allison's own interview notes.

27. Upon information and belief, FBI Agent Allison and Robert Lonsterth informed their CIA handler of the allegation regarding the allegation of the "black operation" at IMC, but did not inform Independent Counsel Walsh:

> We never sought permission from the intelligence agencies for where we could pursue our mandate; to do so would have represented a shocking abdication of our independence, since these agencies included several people whom we were investigating we could scarcely rely on their word for where to stop. Opening Arguments: A Young Lawyer's First Case: United States v. North. Toobin, Viking, p. 173. Emphasis Added.

28. Upon information and belief, FBI Agent Allison and Mr. Lonsterth made an investigative decision, without the knowledge of IC Walsh, not to investigate the plaintiff's grave allegation that the Boland Amendment had been violated whereby "unaudited pooled HHS nonacquiescence funds" had been diverted to the contras thorough a rogue "black operation" that was conducted at International Medical Center, Inc. (IMC), without the knowledge of President Reagan and the Congress. See the April 14, 1988 House Committee on Government Operations report: Medicare Health Maintenance Organizations: The International Medical Centers Experience, which was based in part on the December 15, 1987 sworn Congressional testimony of HHS Inspector General Richard Kusserow, the facts developed by the "mid-1980s" joint FBI-DOJ-HHS task force investigating "Fraud Against the Government" at IMC, and the content of FBI Director Judge Freeh's FOIA withheld "Recarey-extradition" documents as to who knew what and when.

29. Upon termination of the Iran-Contra investigation, all of Independent Counsel Walsh's documents, including the "FBI Agent Allison" documents, were transferred to the National Archives.

30. On April 20, 1995, President Clinton published Executive Order 12958 and established new rules regarding classified information, which included a 10 year rule whereby the burden is on the government to prove that a "classified document" determination was appropriate. 60 FR 19825 (April 20, 1995). See <u>Duration of Classification</u> Section 1.6 (d)(1).

31. On October 30, 1995, the plaintiff filed a FOIA request with the National Archives seeking the release of the documents denominated as the "FBI Agent Allison" documents that had been in the custody of FBI Agent Allison on March 29, 1989:

> FOIA request for the universe of documents that were generated from the March 29, 1989 FBI interview by FBI Agent Allison of Ruppert counsel within the Office of Independent Counsel Lawrence Walsh regarding the diversion of "unaudited pooled nonacquiescence funds" by HHS General Counsel Juan del Real through International Medical Center, Inc. with the knowledge of high level DOJ officials.

32. On November 9, 1995, the National Archives FOIA Officer R. Michael Mc Reynolds, docketed the FOIA request as NN 95-973, denied the request, and advised the plaintiff of the right to appeal.

33. The plaintiff appealed the decision and requested details as to the search for the FOIA requested documents.

34. On December 28, 1995, National Archives Deputy Archivist Lewis J. Bellardo advised the plaintiff that the FOIA requested "FBI Agent Allison" documents had been referred to the CIA. "The document you seek, which we have referred to another agency for review, was classified and is being reviewed under the provisions of Executive Order 12356."

35. Deputy Archivist Bellardo provided details of the FOIA search:

> You ask who Craig Gillen and John Barrett were and why we chose to search their files in response to your request. Both of these men were attorneys in the Office of the Independent Counsel Walsh. Barrett's files were <u>searched because experience with the files of IC Walsh suggest</u> that Attorney Barrett appears to have kept not only

12

all of the documents he created <u>but also all of the documents that ever crossed his desk.  We searched Attorney Gillen's files as he was the recipient of the memo from Special Agent Foster concerning International Medical Center, Inc. (Inc.).</u>

You also ask whether Agent Foster's search of the database was the result of a previous FOIA request you made. As you will see in the documents released though your FOIA request, <u>Foster appears to have searched the data base after receiving copies of news clips on the subject of IMC from the FBI.</u>  In addition, Congressman Pete Stark referred a newspaper article to the Independent Counsel for possible investigation.

<u>We have continued to review the "Bulky Evidence" files.</u> While we have found some documents created by Carol Allison, these documents do not refer to International Medical Center <u>and are not responsive to your request</u>. Emphasis Added.

36. The plaintiff appealed that decision.

37. On April 3, 1996, the National Archives Director Textual Reference Division  R. Michael Mc Reynolds  denied  the appeal:

This is in further response to your October 30, 1995 Freedom of Information request (our reference NN 95-973) regarding certain records of Independent Counsel Lawrence Walsh.

<u>After consultation with the Central Intelligence Agency,</u> we have determined that we must continue to withhold portions of the enclosed document under the Freedom of Information Act, 5 U.S.C. 552 (b)(3). The statute for withholding is 50 USC 403.

38. Attached to the denial was page 2 with the denomination "Top Secret Codeword Working Papers" with  dates and a list of code numbers.

39. The plaintiff appealed that decision.

40. On February 2, 1998, the plaintiff requested that the National Archives render a final decision regarding their decision to withhold the National Archives copy of the FOIA requested "FBI Agent Allison" documents.

41. On  February 27, 1998, the plaintiff filed a FOIA request   directly with FBI Director Judge Freeh which sought  the release of the FBI's copy of the  "FBI Agent Allison" documents.

13

42.  On March 25, 1998, the plaintiff filed an "amended FBI Agent Allison documents" FOIA request directly with FBI Director Judge Freeh and sought the "universe of documents that former-Acting FBI Director Floyd Clarke had identified as the "FBI 62-0 file" in order that FBI Director Judge Freeh was provided accurate information from his own FBI staff regarding the grave allegation made by Snowflake 5391 that the July 25, 1985 sworn Congressional testimony that the nonacquiescence policy of HHS General Counsel del Real had ended on June 3, 1985, was false Congressional testimony in order to conceal the "black operation" at IMC through which "unaudited pooled HHS nonacquiescence funds" were diverted to the contras in violation of the Boland Amendment.

43.  On April 10, 1998, Deputy Archivist/Chief of Staff Lewis J. Bellardo affirmed the decision to withhold the FOIA requested documents based on the CIA's decision to use FOIA Exemption 3 to protect its sources and methods:

> After consulting with the Central Intelligence Agency, NARA determined that the release of some of the information in one of the documents you sought had to be withheld under the provisions of the National Security Act of 1947 as amended, 50 U.S.C. 403(d)(3) and thus under section (b)3 of 5 U.S.C. 552. After reviewing the material again, I have determined that this material would still lead to the disclosure of intelligence sources and methods and thus must remain withheld under the provisions of 5 U.S. C. 552 (b)(3).

44.  On May 13, 1998, the plaintiff filed the FOIA complaint Snowflake 5391, a/k/a Charles Robert v. The National Archives, the Department of Justice, the Department and Health and Human Services, and the Social Security Administration.

45.  On June 5, 1998, the plaintiff requested that CIA Director Tenet render his final decision or release the documents being withheld by the CIA pursuant to FOIA Exemption 3, and provided CIA Director Tenet with a copy of the Snowflake 5391 complaint.

46.  On July 8, 1998, CIA Attorney Advisor Guyron C. Watts advised the plaintiff:

> This is in response to your letter addressed to the Director of Central Intelligence George Tenet dated 5 June 1998, in which you requested that the CIA review the National Archives' Freedom of Information Act (FOIA) Officer's use of FOIA exemption (b)(3) in Snowflake 5391 v. DOJ, the



National Archives, the DHHS, and SSA. Pursuant to your request, the CIA declines to review the National Archives' use of FOIA Exemption (b)(3). As you are aware, this case is in litigation; thus, if necessary, the CIA will respond to the National Archives' use of FOIA Exemption (b)(3) in the course of the litigation. Emphasis Added.

47. On February 16, 1999, pursuant to 28 C.F.R. § 17.24 (e) and § 17.31, the plaintiff filed a request directly with Attorney General Reno to declassify the "FBI Agent Allison" documents that the CIA had withheld pursuant to FOIA Exemption 3.

48. On March 17, 1999, DOJ FOIA Deputy Director Margaret Ann Irving referred the request to declassify the "FBI Agent Allison" documents to the FBI. "Please be advised that your request has been forwarded to the Federal Bureau of Investigation for declassification review and direct response to you."

49. On June 8, 1999, Judge Wexler granted AG Reno's Motion to sever the defendants, made by AUSA Kathleen Mahoney who was also AG Reno's lead in Ford v. Apfel, granted plaintiff leave to separate the claims set forth therein into separate actions, ordered the plaintiff not to file the severed actions as related cases, and ordered the plaintiff not to use the pseudonym Snowflake 5391 rather than his own name.

50. Pursuant to Judge Wexler's Snowflake 5391 order, an amended complaint was filed as Robert v. National Archives, cv 98-3598, (Wexler, J) and the three separate actions were filed as Robert v. HHS, cv 99-3648, Robert v. DOJ, cv 99-3549, and Robert v. SSA, cv 99-3550, which were apparently randomly administratively assigned to Judge Mishler.

51. On January 4, 2000, after AUSA Mahoney had filed her December 22, 1999 Robert v. DOJ Motion to Dismiss, the honorable and courageous FBI FOIA Officer Chief Kelso released 468 documents from the FOIA requested "FBI 62-0 file" that had heretofore been withheld from the plaintiff by the FBI.

52. Some of the released "FBI 62-0 file" documents included redaction of content, including the names of government officials to whom copies of documents had been copied, which prevented Snowflake 5391 from learning who knew what and when within the FBI given the grave allegations that CIA's assets within the FBI knew that a rogue domestic CIA "black

15

operation" had been implemented at International Medical Center, Inc. which involved the illegal diversion of "unaudited pooled HHS nonacquiescence funds" to IMC President Miguel Recarey and his Chief of Staff Juan del Real and onto the contras in violation of the Boland Amendment without the knowledge of President Reagan or the Congress, and contrary to the sworn July 25, 1985 Congressional testimony of DAAG Kuhl that the nonacquiescence policy of HHS General Counsel del Real had ended on June 3, 1985.

53. In his January 4, 2000 letter, Chief Kelso also advised that certain documents could not be located and when located would be forwarded after being reviewed:

> Also, Documents 63-20470-X and X4 Enclosure Behind File cannot be located at the present time. Efforts are continuing to retrieve this material. When these documents are located, they will be reviewed for release and forwarded to you at the earliest possible date. Emphasis Added.

54. In Robert v. National Archives, the plaintiff argued that Executive Branch agencies were implementing a documentary shell game by "loaning" FOIA requested documents from one government agency to another in order to circumvent judicial review of the decisions to withhold documents, as discussed in United States Dept. of Justice v. Tax Analysts, 492 U.S. 136, 109 S.Ct. 2841 (1989), dicta:

> Because the requested materials ordinarily will be in the agency's possession at the time the FOIA request is made, disputes over control should be infrequent. In some circumstances, however, requested materials might be on loan to another agency, "purposely routed.. .out of agency possession in order to circumvent (an impending) FOIA request," or "wrongfully removed by an individual after a request is filed." Kissinger v. Reporters Committee for Freedom of Press, cites omitted. We leave consideration of these issues to another day. Id. at n. 6, p. 2848. Emphasis Added.

55. On May 22, 2000, Judge Wexler granted AUSA Mahoney's Motion to Dismiss Robert v. National Archives and held:

> The court has reviewed the Ronan declaration as well as the voluminous affidavit and memorandum of law submitted by Plaintiff. The agency declaration provides a clear and detailed explanation of the agency processing of Plaintiff's request and

16


sustains the burden of showing proper agency action.   The declaration makes clear that a through search was conducted and the 'Agent Allison' documents sought in this litigation were not in the agency's possession." Emphasis Added.

56.  In his  May 22, 2000 decision, Judge Wexler  noted that the documents that were transferred from the National Archives to the CIA may be in the possession  of another government agency.   "If other agencies are in possession of those documents, plaintiff can (and no doubt has or will) make inquiry to those agencies to be in possession of responsive documents." Judge Wexler's  May 22, 2000 Robert v. National Archives decision at p. 6. Emphasis Added.

57.  On June 7, 2000,  the plaintiff appealed that decision to the Second Circuit.

58.  On June 27, 2000, the plaintiff requested a final  FOIA decision from CIA Director Tenet.

59.  On June 27, 2000,  in Robert v. DOJ,   the   honorable and courageous FBI FOIA Section Chief Kelso advised the plaintiff that efforts were continuing to locate the documents within the FBI:

> In my letter of January 4, 2000, you were advised that 63-20470-X4 Enclosure Behind File (EBF) could not be located at the present time. This 70 page EBF has now been located and is enclosed. It is being released to you in its entirety. Efforts are continuing to locate the Document 63-20470 -X. Emphasis Added.

60.  On June 29, 2000, in Robert v. DOJ, cv 99-3649, (Mishler J),  Acting Chief of the FBI Litigation Unit Scott A. Hodes advised  Judge Mishler  that the FBI's copy of the "FBI Agent Allison" documents could not be located and that FBI Agent Allison had no recollection of the documents or the March 29, 1989 meeting with the plaintiff. "After reviewing the background material submitted by plaintiff, SA Allison advised that she had no recollection of interviewing plaintiff and did not retain any documentation of any such interview."   June 29, 2000 Declaration of  Acting Chief of the FBI Litigation Unit Scott A. Hodes,  at ¶ 8.

61. On July 1, 2000, the CIA publicly revealed that it was reevaluating for accuracy the filing of a sworn affidavit in a different case in which classified information was withheld regarding the sale of explosives by a CIA asset:

> The DOJ has said in court papers that, 'With the benefit of retrospection and in light of all the information now known to the department, it appears that the (affidavit) was inaccurate.

> But some high ranking CIA and DOJ officials believed that at the time and said so, such as in the internal DOJ memo titled "Duty to Disclose Possibly False Testimony. In the Beltway, the feds got their man, but do they feel good about it? ABA Journal, July 2000, p. 30.

62. On July 6, 2000, CIA Attorney-Advisor Guyron C. Watts again advised the plaintiff that the CIA would respond in the course of the Snowflake 5391 v. DOJ, the National Archives, the DHHS, and SSA. litigation:

> This is in response to your letter dated 27 June 2000, in which you requested that the CIA review the National Archives' Freedom of Information Act (FOIA) Officer's use of FOIA Exemption (b)(3) in Snowflake 5391 v. DOJ, the National Archives, the DHHS, and SSA. Pursuant to your request, the CIA again declines to review the National Archives' use of the FOIA exemption (b)(3). As indicated in my letter dated July 8, 1998, this case is in litigation; thus, if necessary, the CIA will respond to the National Archives' use of FOIA exemption (b)(3) in the course of the litigation. Emphasis Added.

63. On July 25, 2000, interpreting the July 6, 2002 letter from CIA Attorney-Advisor Guyron C. Watts as being CIA Director Tenet's final decision, the plaintiff filed Robert v. CIA, cv 4325 (Seybert, J).

64. On August 11, 2000, the CIA moved to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim for which relief may be granted.

65. On August 28, 2000, CIA Public Information Release Division Kathryn I. Dyer filed a Declaration in support of the CIA Motion to Dismiss citing to the first page of National

18

Archives FOIA letter citing the CIA's use of the FOIA Exemption 3 defense, but not discussing the second page with its "North Notebook" notation.

66.  On September 29, 2000, the plaintiff filed a FOIA request with CIA Director Tenet seeking the CIA documents withheld pursuant to FOIA Exemption 3 by National Archives FOIA Officer Mc Reynolds as identified in his April 4, 1996 page two attachment.

67.  On January 6, 2001, the FOIA request  was docketed as F-2001-000176.

68.  On July 16, 2001, Judge Seybert granted the CIA's Motion in Robert v. CIA  and dismissed the complaint, without prejudice,  because the plaintiff had not exhausted his administrative remedies:

> Prior to filing the instant complaint, the Plaintiff filed his document request with the NARA, but did not file a request with the CIA. As set forth in the applicable regulations, however, the CIA is only required to process requests for documents made in accordance with the applicable regulations (see 32 C.F.R.§ 19200.21 (a), incorporating 32 C.F.R. §§ 1900.11-1900.13) and neither Plaintiff's request nor his subsequent complaint to NARA constituted an exhaustion of administrative remedies. Thus, Plaintiff's claim that the CIA improperly withheld agency records is not yet ripe for adjudication. Accordingly, this Court lacks subject matter jurisdiction and the Complaint must be dismissed. Slip op. 6. Emphasis added.

69.  On December 7, 2001, the CIA FOIA Officer rendered a decision denying the September 29, 2000  FOIA request, which on  January 6, 2001  was docketed as Docket F-2001-00176,  and advised that no records responsive to the request were located.

70.  On January 16, 2002, the plaintiff appealed the CIA FOIA Officer's decision to the CIA Agency Release Panel.

71.  On February 5, 2002, CIA Information and Privacy Coordinator Kathryn I. Dyer acknowledged  the FOIA appeal  of  F-2001-00176.

72.  On December 2, 2002, CIA Agency Release Panel Vice Chairman Herbert O. Briick affirmed the denial of the FOIA request.

Your appeal has been presented to the appropriate members of the Agency Release Panel, the Information Review Officers for the Directorate of Operations, and the Director of Central Intelligence area. Pursuant to the authority delegated under § q1900.43 of Chapter XIX, Title 32 of the Code of Federal Regulations (C.F.R.), they directed that a thorough search be conducted for those records systems which could reasonably be expected to contain documents responsive to your request. At this time I must inform you that this agency has identified no records responsive to your request. Further in regard to your appeal and in accordance with CIA regulations at 32 C.F.R. § 1900.41 (c)(2), the Agency Release Panel has affirmed that determination. Emphasis Added.

### FACTS AS TO THE FOIA REQUESTED "DOJ -CIA" DOCUMENTS

73. On March 1, 2001, the plaintiff filed a FOIA request seeking the DOJ "CIA Litigation" documents which were the documents relied upon by Attorney General Ashcroft's attorneys when they litigated Robert v. CIA in order to determine whether AG Ashcroft's attorneys were providing AG Ashcroft with the truth, the whole truth, and nothing but the truth, regarding litigation decisions being made by rogue CIA assets within the DOJ, who were consulting with their CIA handlers, who were making decisions on behalf of CIA Director Tenet, upon information and belief, without the knowledge of CIA Director Tenet.

74. On March 15, 2001, DOJ Office of Information and Privacy Chief Administrative Unit Claudia J. Tweed docketed the FOIA appeal as 01-1619.

75. On April 2, 2001, the plaintiff requested an expedited DOJ decision regarding the FOIA requests seeking the release of the "CIA litigation" documents, along with the pending "Recarey Extradition" documents and the "Ford Solicitor General" documents (upon which Acting Solicitor General Barbara Underwood decided not to appeal Judge Sifton's nationwide Ford v. Apfel class decision that presently affects millions legally defenseless aged, blind, and disabled SSI recipients whose due process rights were denied and their benefits were terminated or reduced because of the implementation of the post-June 3, 1985 nonacquiescence policy of

former-HHS General Counsel del Real contrary, to the sworn July 25, 1985 Congressional

testimony of DAAG Kuhl that the nonacquiescence policy had ended on June 3, 1985 as

defended by AUSA Mahoney, because of the remedy that SSA Commissioner Barnhart and

Attorney General Ashcroft are proposing to cure the due process rights of the Ford class as of

the class certification date of April 9, 1994).

76. On May 1, 2001, DOJ Co-Director Richard Huff advised the plaintiff that the FOIA

appeal for the "CIA" documents was closed:

> You appealed <u>from the action of the Executive Office of the United States</u>
> <u>Attorneys on your request for an investigation into the propriety of</u>
> <u>withholding of certain documents by the Central Intelligence Agency.</u>
>
> Please be advised that the function of the Office of Information and
> Privacy is limited to the adjudication of appeals from denials of access to
> information pursuant to the Freedom of Information and Privacy Acts by
> components of the Department of Justice. Inasmuch as this Office lacks
> the authority to compel the EOAUSA to conduct the investigation you
> requested, <u>I am closing your appeal file in this office.</u> Emphasis Added.

77. On May 18, 2001, the plaintiff appealed the Co-Director Huff's May 1, 2002

decision and specifically requested that, given the grave allegation that CIA assets within the

DOJ were making litigation decisions without the knowledge of AG Ashcroft, that Co-

Director Huff take appropriate action in order that AG Ashcroft has an opportunity to read the

FOIA requested documents.

78. On June 12, 2001, the plaintiff requested that Co-Director Huff recall his decision to

deny the FOIA request for the "Recarey extradition" documents in order that AG Ashcroft had an

opportunity to read the FOIA requested "Recarey extradition" and "CIA litigation" documents in

tandem order that AG Ashcroft could determine for himself whether AG Ashcroft had lost

"command and control" of litigation decisions to CIA assets within the DOJ who were making

litigation decisions knowing that the truth, the whole truth, and nothing but the truth was <u>not</u> being provided to AG Ashcroft. <u>See</u> the pending <u>Robert III v. DOJ</u> complaint.

79. On June 20, 2001, the plaintiff filed <u>Robert III v. DOJ</u> and sought the release of the "Recarey extradition" documents upon which FBI Director Judge Freeh had determined <u>not</u> to extradite the fugitive International Medical Center, Inc. President Miguel Recarey from Spain.

80. On January 14, 2002, FOIA Co-Director Richard L. Huff rendered his decision affirming the denial decisions <u>not</u> to release the "Ruppert", "Stone", and "Gordon" documents, which track the DOJ's defense of the clandestine implementation of the post-June 3, 1985 nonacquiescence policy of HHS General Counsel del Real and are now being sought in <u>Robert IV v. DOJ</u>, and provided the defendant's reasons:

> The EOUSA properly withheld certain information that is protected from disclosure pursuant to:
>
> > 5 U.S.C. § 552 (b) (2), which concerns matters that are related solely to internal agency practices (including, in this instance, administrative markings);
> >
> > 5 U.S.C. § 552 (b) (5), which concerns certain inter-and intra-agency communications protected by the deliberative process privilege; and
> >
> > 5 U.S.C. § 552 (b) (7) (C), which concerns records or information compiled for law enforcement purposes, the release of which could reasonably be expected to constitute an unwarranted invasion of the personal privacy of third parties.
>
> <u>I have determined that this information is not appropriate for discretionary release</u>. Emphasis Added.

81. On January 25, 2002, the Second Circuit rendered a <u>Robert v. DOJ</u> Summary Order and affirmed Judge Mishler's decision dismissing the FOIA cause of action seeking the release of

the "Charles Robert criminal investigative file" documents because the plaintiff had failed to exhaust administrative remedies.

82. On February 15, 2002, the plaintiff filed <u>Robert IV v. DOJ</u> and sought the release of the "Charles Robert criminal investigative file" documents, the "Shaheen-law enforcement" documents, the "Ruppert" documents, the "Stone" documents, and the "Gordon" documents to present to AG Ashcroft as "smoking gun" evidence that CIA assets within the DOJ were making litigation decisions implementing the pre-June 3, 1985 nonacquiescence policy of former-HHS General Counsel del Real, contrary to the sworn July 25, 1985 Congressional testimony of DAAG Kuhl that the nonacquiescence policy had ended on June 3, 1985, by intentionally not reprogramming the HHS and SSA computers to apply the "acquiescence" standards.

83. On October 8, 2002, the plaintiff requested that Co-Director Huff issue the final FOIA decision regarding the request for the "CIA litigation" documents and requesting that Co-Director Huff provide a "heads up" memo to AG Ashcroft regarding the content of the FOIA requested "DOJ-CIA" documents along with the <u>Robert III v DOJ</u>, <u>Robert IV v. DOJ</u>, and <u>Robert III v. HHS</u> withheld documents, and then consider plaintiff's offer of <u>settlement</u> in <u>Robert III v DOJ</u>, <u>Robert IV v. DOJ</u>, and <u>Robert III v. HHS</u> that Eastern District of New York AUSAs Mahoney and Riley had rejected, upon information and belief, without consulting with their clients.

84. On November 19, 2002, the plaintiff wrote directly to Attorney General Ashcroft and requested that he review the <u>Robert III v. DOJ, Robert IV v. DOJ, and Robert III v HHS</u> litigation strategy of AUSA Riley and AUSA Mahoney, that AG Ashcroft <u>support</u> the plaintiff's application in <u>Robert III v. DOJ</u> to <u>seal</u> a "mosaic of documents" that reveals that CIA sources and methods within the HHS, DOJ, and FBI participated in the CIA <u>domestic</u> "black operation" that had been conducted at International Medical Center, Inc., and review the DOJ's defense of

23

the SSA _Christensen_ nonacquiescence policy which   had resulted in   the unintended consequence of Attorney General Ashcroft adopting AUSA Mahoney's  decision to expand  the pre-June 3, 1985 nonacquiescence policy of HHS General counsel del Real   to include not acquiescing  to the Supreme Court's _Christensen_ decision  as applied to millions of legally _defenseless_ _Ford_ class members in all 50 States.

85.  On December 9, 2002, Deputy Legal Counsel Mc Clendon of the Executive Office the United States Attorneys  referred the request for a review of the _Robert III v. DOJ_, _Robert IV v. DOJ_, and _Robert III v. HHS_ litigation strategy and AUSA Mahoney's    _Christensen_ nonacquiescence policy,  to U.S. Attorney Mauskopf.

86.  On December 17,  2002, the plaintiff advised Co-Director Huff of the final decision by the CIA Agency Release Panel,   requested a final decision regarding the "DOJ-CIA" documents by December 30, 2002, and    again respectfully suggested that AG Ashcroft be provided a "heads up" memo as to plaintiff's offer of settlement.

87.   Upon information and belief, as part of their "denial and deception" litigation strategy, the CIA handlers of the CIA assets within the DOJ ordered FOIA  Co-Director Huff not to respond the FOIA request for a final decision,  which if rendered may  reveal internal DOJ policy and practice the CIA assets within the DOJ  implementing a "plausible deniability" litigation strategy   not to provide AG Ashcroft with any information regarding the plaintiff's ongoing offer of settlement.

88.  More than thirty days has passed since the plaintiff filed the FOIA requests for the "CIA litigation" documents   in the custody of  Attorney General Ashcroft's Executive Office of the United States Attorneys.

89. Pursuant to 5 U.S. C. § 552  (6)(C), a requester is "deemed to have exhausted his administrative remedies with respect to such request if the agency fails to comply with the applicable time limit provisions of this paragraph."

**BACKGROUND INFORMATION AS TO INTERRELATIONSHIP BETWEEN THE USE OF THE FOIA EXEMPTION 3 DEFENSE, THE CIA'S "NORTH NOTEBOOK" DOCUMENTS, AND THE COLLATERAL DAMAGE CAUSED BY THE DOJ'S DEFENSE OF THE PRE-JUNE 3, NONACQUIESCENCE POLICY OF HHS GENERAL COUNSEL DEL REAL FROM 1982-2002.**

90. FOIA Exemption 3 provides Attorney General Ashcroft and CIA Director Tenet with the standard to apply when withholding  FOIA requested documents  that  the CIA Director, in his discretion, determines could reveal the sources and methods of the CIA:

> (3)   disclose matters specifically exempted from disclosure by statute (other than section 552 of this title), provided that such statute (A) requires that the matters be withheld from the public <u>in such a manner as to leave no discretion on the issue</u>, or (b) <u>establishes particular criteria</u> for withholding or refers to particular types of matters to be withheld;

91. FOIA Exemption 3  is  used to protect the release of  documents that  will reveal covert actions  conducted by the CIA's assets  including any covert  Top Secret  "black operation"  which  is  exempt  from  the  standard reporting responsibilities to  Members  of Congress:

> Publicly   acknowledged   programs   are   considered   distinct   from unacknowledged   programs,   with   the   latter   <u>colloquially referred to as "black" programs because their very existence and purpose are classified.</u> Among black programs, further distinction is made for "waived" programs, considered to be so sensitive that they are exempt from standard reporting requirements to the Congress. The chairperson, ranking members, and, on occasion, other members and staff of relevant Congressional committees <u>are notified only orally of the existence of these programs.</u> <u>Secrecy: Report of the Commission on Protecting and Reducing Government Secrecy: 1997.</u> p. 26. xxxix. Emphasis Added.

92. Covert action  is  defined as any "clandestine activity designed to  influence <u>foreign</u> governments, events, organizations or persons in support of U.S. <u>foreign</u> policy conducted in such a way that the involvement of  the U.S. government is not apparent". <u>Final Report of the</u>

Select Committee to Study Governmental  Operations with Respect to Intelligence Activities, Washington: United States Government Printing Office, 1976, commonly called the "Church Committee" report.

93.  The term blowback refers "to the unintended consequences of polices that were kept secret from the American people." See Chalmers, Blowback,  Henry Holt and Company, at p. 8.

94.  On December 1, 1981, President Reagan authorized a covert CIA operation to assist the contras in the overthrow of the Nicaraguan government. Shadow: Five Presidents and the Legacy of Watergate. Woodward, Simon and Schuster, p. 108. The Iran-Contra Scandal: The Declassified History. Kornbluh and Byrne, The New Press, Document 1, p. 11.

95.  In  January, 1982, HHS General Counsel del Real made a litigation decision not to acquiesce to Judge Pratt's January 7, 1982 Ruppert I  remand decision by which HHS Secretary Schweiker was to decide whether the due process clause of the Constitution required HHS Secretary Schweiker  to provide oral explanations to plaintiff Mary  Ruppert of the standard used to reduce her monthly SSI benefits from date of application. See Glasgold-Ruppert v. Califano, 558 F. Supp. 129, 151  (E.D. N.Y. 1982).

96.  In 1982,  the Department of Justice  entered into a   contract with the Inslaw corporation for the use of  computer program known as "Promis" which would allow the Justice Department to  track  the  progress  of cases  through  the  94  United  States  attorneys'  offices throughout the country,  including the HHS  "nonacquiescence" cases as determined by HHS General Counsel del Real. Report Says Justice Department Stole Computer Software in 80's. N.Y. Times 8-12-92.

97.  In 1982, the DOJ breached the Inslaw contract by selling the program to third parties. "The evidence received by the committee during its investigation clearly raises serious concerns about the possibility that a high-level conspiracy against Inslaw did exist and that great

efforts have been expended by the department to block an outside investigation in the matter."

Report Says Justice Department Stole Computer Software in 80's. N.Y. Times 8-12-92.

98. Upon information and belief, the DOJ provided the "Promis" computer program to the CIA in order that the CIA could monitor DOJ litigation, which would include the "nonacquiescence" cases which would allow for the diversion to "black operations" of "unaudited pooled HHS nonacquiescence funds" that could be clandestinely diverted for projects to protect the national security without the knowledge of the Members of Congress, without the knowledge of the President, and without the knowledge of millions of legally defenseless aged, blind, and disabled persons citizens who would otherwise receive the benefits as intended by the Congress.

99. On June 17, 1982, HCFA Project Officer G. Theodore Saffran established the Medicare payment rates for the Demonstration Project that would be established at International Medical Center, Inc. whereby Medicare monies would be paid to IMC pursuant to a capitation fee. Document secured pursuant to a FOIA request and one of the "mosaic" of documents that the plaintiff seeks to be sealed to protect the CIA's sources and methods within HHS.

100. On July 20, 1982, the Seventh Circuit rendered its Jackson v. Schweiker, 683 F.2d 1076 (7th Cir. 1982), decision interpreting the SSI income regulation when a private rent subsidy is provided an SSI recipient which HHS General Counsel determined to be "incorrectly" decided, would not be appealed to the Supreme Court, would not be followed in other cases, and that the HHS claims representatives would continue to input private rent subsidies as income into the HHS computer in order to reduce aged, blind, and disabled SSI recipients benefits that Congress intended that they should receive, in order that "unaudited pooled HHS nonacquiescence funds" could be diverted for purposes not intended by the Congress.

101. On March 25, 1983, HCFA Director Wayne A. Fowler approved a voucher for the issuance of a United States Treasury Check in the amount of $ 981.795 to be sent to International Medical Centers, Inc.  Document secured pursuant to a FOIA request and one of the "mosaic" of documents that the plaintiff seeks to be sealed to protect the CIA's sources and methods within HHS.

102. On April 12, 1983, the Senate Intelligence Committee was advised  at a closed session of a modest covert program in Nicaragua. Turmoil and Triumph: My Years As Secretary of State, Schultz,  Charles Scribner's Sons, at, p. 301.

103. In September, 1983 HHS General Counsel Juan del Real  issued   Medicare Provider Manual § 3788 Payment Procedures which explained the   Medicare nonacquiescence policy whereby the standard applied by providers and fiscal intermediaries to determine eligibility for Medicare benefits  was not the duly promulgated regulatory standard or the holdings of federal court decisions below the Supreme Court interpreting the regulations, but   the standard as established by HHS General Counsel del Real:

> A decision by the Supreme Court of the United States is unqualifiedly binding and is a precedent for all similar cases. A decision of a lower Federal Court is binding only for that case. Although other courts within the territorial jurisdiction of the court rendering the decision may use it as precedent in similar cases, each case must be filed and an individual court decision made. The Secretary determines whether, and to what extent, the ruling is to be followed in other similar cases.

> Where HCFA requests an intermediary to effectuate a court decision, whether of the Supreme Court or a lower court, the decision will be effectuated only with respect to that case. HCFA issues any necessary revisions or modifications of policies for application to other cases. Until received, continue to follow existing instructions. Emphasis Added.

104. Subsequently, HHS General Counsel del Real determined not to  appeal Second Circuit's  Kraemer v. Secretary, 737 F. 2d 244 (2d Cir. 1984), decision which provided    HHS General Counsel del Real  with actual knowledge that the Medicare appeal process was flawed,

but which  HHS General Counsel del Real and determined <u>not</u>  to  appeal to the Supreme Court and <u>not</u> to correct the flaws in the  Medicare appeal procedure identified by the Second Circuit.

105.   HHS General Counsel del Real's  Medicare nonacquiescence policy was implemented by the Florida HMO International Medical Center so as <u>not</u> to apply the Medicare duly promulgated regulatory standards as the standard in rendering coverage decisions for  its IMC  HMO   Medicare beneficiaries who sought payment for medical needs. <u>See   Miami Mystery: Paid to Treat Elderly, IMC Moves in Worlds of Spying and Politics: Medicare Money Flowed in: Only Mr. Recarey Knows Where It Flowed Next: Congress, "bugs" and Mob</u>. Wall Street Journal 8-8-1988.

106.  In "early December" 1983  IMC President Recarey met with an HHS official and offered him a job at IMC.  April 14, 1988 House Committee on Government Operations report: <u>Medicare Health Maintenance Organizations: The International Medical Centers Experience</u>, p.14.

107.  In "late 1983 or early 1984, IMC was given a $1 million advance payment in addition to its regular capitation payments." April 14, 1988 House Committee on Government Operations report: <u>Medicare Health Maintenance Organizations: The International Medical Centers Experience</u>, p.14.

108.  In 1984, National Security Counsel aide Retired Navy Admiral John Poindexter was involved in a 1984 initiative that gave intelligence agencies broad authority to examine computer data bases for 'sensitive but not classified information.' <u>Chief Takes Over at Agency to Thwart Attacks on U.S</u>. Markoff,  New York Times, 2-13-02, A 27.

109.  On June 25, 1984, at a meeting of the National Security Planning Group Meeting on Central  America,  then-White House Counsel Edwin Meese advised that the Department of Justice should be informed of any actions:

As another non-practicing lawyer, <u>I want to emphasize that it's important to tell the Department of Justice that we want them to find the proper and legal basis which will permit the United States to assist in obtaining third party resources for the anti-Sandistas.</u> You have to <u>give lawyer's guidance when asked a question. The Iran-Contra Scandal: The Declassified History.</u> Kornbluh and Byrne, The New Press, p. 80.  Emphasis Added.

110.  On October 10, 1984, the Congress passed the Boland Amendment and suspended all aid to the contras. "During the fiscal year 1985, no funds available to the Central Intelligence Agency, the Department of Defense, or any other agency or entity of the United States involved in intelligence activities may be obligated or expended for the purpose or which would have the effect of supporting directly or indirectly military or paramilitary operations in Nicaragua by any nation, group, organization, movement, or individual. " <u>Turmoil and Triumph: My Years As Secretary of State,</u> Schultz,  Charles Scribner's Sons, at p. 421.

111.  Attorney General Smith designated Assistant Attorney General (AAG)  Richard Willard to be  the head of an inter-agency team that drafted an anti-leak order,  National Security Decision Directive 84,  that President Reagan had issued to prevent unauthorized disclosures of leaks of classified information and which  subjected federal employees  to possible dismissal if they refused to take polygraph tests in investigations of disclosures of classified information. <u>Aide Says Fears Led to Contra Affair,</u> N.Y. Times, 2-15-92.

112.  On December 14, 1984, CIA Deputy Director William Gates wrote a memo to CIA Director Casey regarding the  diminishing chance of the  contras overthrowing the Nicaraguan government without additional funding.  "Without US funding for the contras, the resistance essentially will collapse over the next year or two."  <u>The Iran-Contra Scandal: The Declassified History.</u> Kornbluh and Byrne, The New Press,  p. 49.

113.  In December, 1984,   HHS General Counsel del Real instructed  Inspector General Kusserow to initiate  a "Fraud Against the Government" investigation of the plaintiff,   which was  coordinated with the Department of Justice's criminal investigation of the plaintiff, who the DOJ had denominated  as Snowflake 5391,   in order to eliminate counsel opposing the implementation of the nonacquiescence policy of HHS General Counsel del Real.

114.   Upon information the DOJ "Fraud Against the Government" investigation was conducted by rogue CIA assets within the Department of Justice without the knowledge of U.S. Attorney Dearie and subsequently U.S. Attorney Maloney. See the Robert III v. DOJ documents being withheld based on the use of the "glomarization" defense and the Robert IV v. DOJ "Charles Robert criminal  investigative file" documents which are  now in the custody of U.S. Attorney Mauskopf with the actual  knowledge of the Executive Office of  the United States Attorneys.

115.   In January, 1985,  HHS Inspector General Kusserow led   a joint Department of Justice, Federal Bureau of Investigation, and HHS Office of the Inspector General task force, that was investigating     International Medical Center, Inc. which   was allegedly committing "Fraud Against the Government".   See the October 1, 1999 Declaration of Special Agent (criminal investigator) Edward N. Le Faiver, Jr. filed by the government in Robert v. HHS, cv 99-3648 (Mishler, J).

116.   The  HHS Headquarters Coordinator of  the joint DOJ-FBI-HHS task force was Michael Cesario who implemented the   orders of  HHS Inspector General Kusserow. See the October 1, 1999 Declaration of  HHS Deputy Assistant Inspector  General (DIGI), Office of Inspector General (OIG), Department of Health and Human Services (HHS),   filed by the government in Robert v. HHS, cv 99-3648, (Mishler, J).

117.  In January, 1985,  HHS Inspector General Kusserow assigned six Special Agents to the "Fraud Against the Government" investigation of Snowflake 5391 with instructions to review over 200 of the case files of Snowflake 5391's  clients who appealed denials of Medicare, Social Security, and SSI benefits and who challenged HHS General Counsel del Real's nonacquiescence policy whereby he instructed HHS staff not to apply the standards in duly promulgated regulations, not to acquiesce to unappealed Court decisions, and not to appeal "unfavorable" decisions in order that the legal issue not percolate to the Supreme Court. See  the defendant's Robert v. Holz Declarations filed with Judge Wexler.

31

118. On March 7, 1985, IMC President Miguel Recarey requested that HCFA Regional Administrator George Holland  grant  a  three year waiver from HMO enrollment regulations. See the April 14, 1988 <u>Medicare Health Maintenance Organizations: The International Medical Centers Experience</u>,  at p. 4.

119. On April 4, 1985, HCFA Regional Administrator George Holland advised  IMC President Recarey on Notice that the application for a waiver had been granted. "We believe that you currently meet the requirement for a waiver during the initial three year period." Document secured in FOIA request and one of the "mosaic" of documents that the plaintiff seeks to be sealed to protect the CIA's sources and methods within HHS.

120. On April 22, 1985, Col. Oliver North  made notations in his Notebook,  which now has    the "Top Secret Codeword Working Papers" classification regarding "IMC" with the code "AMX000620", "14096", and "call from Clarridge",  and recorded some of the facts of the plan to provide support to the contras in violation of the Boland Amendment.

121. In May, 1985, HHS IG Kusserow assigned   six Special Agents  to   interrogate,  ex parte,  over a score of  plaintiff's clients in their homes at which  the six Special Agents  inquired of the legal advice the plaintiff  was providing and the legal fees he was charging in the cases challenging the nonacquiescence policy of HHS General Counsel del Real. <u>See</u>   the defendant's <u>Robert v. Holz</u> Declarations filed with Judge Wexler.

122. On May 7, 1985, HCFA Regional Administrator George R. Holland reaffirmed the waiver provided to IMC.   Document secured in a FOIA request and one of the "mosaic" of documents that the plaintiff seeks to be sealed to protect the CIA's sources and methods within HHS.

123.   On May 30, 1985,   IMC Counsel Allan M. Fox wrote  to  HCFA Regional Administrator George Holland clarifying IMC's position regarding requesting waivers of

regulations to monitor its enrollment efforts in return for the three year waiver of HMO enrollment regulations. See  Medicare Health Maintenance Organizations: The International Medical Centers Experience, at p. 5.  Document secured in a FOIA request and one of the "mosaic" of documents that the plaintiff seeks to be sealed to protect the CIA's sources and methods within HHS.

124.  On June 6, 1985, the Senate, and on June 12, 1985, the House, approved the appropriation of $ 27 million for humanitarian aid to the contras.

125.  On June 30, 1985, Col. North met with contra military leaders and implemented plans to raise funds and deliver arms to the contras through  offshore enterprises managed by Richard Secord. Banana Diplomacy; The Making of American Policy in Nicaragua 1981-1987, Gutman, Simon and Schuster, at p. 17.

126.  In July, 1985, IMC President Recarey met with IMC's attorney and IMC's lobbyist in the office of Acting HCFA Director C. Mc Clain Haddow.   Medicare Health Maintenance Organizations: The International Medical Centers Experience, at  p. 10.

127.  In July, 1985, the most honorable and courageous Southern District of New York U.S. Attorney Rudolph Giuliani implemented his "just say no" policy whereby U.S. Attorney Giuliani refused to defend the post-June 3, 1985  nonacquiescence policy of HHS General Counsel del Real.

128.  On July 24, 1985, in response to the  zealousness of the HHS General Counsel del Real's  six Special Agents  interrogating his clients, ex parte, in their homes and inquiring of the legal advise that the plaintiff  had provided his clients and the legal fees he charged, Ruppert counsel  wrote a letter to Judge Altimari complaining about the       government's retaliatory rules of   litigation engagement in the litigation challenging the nonacquiescence policy of HHS General Counsel del Real, and  requesting a Ruppert v. Heckler conference.

129.   On July 25, 1985, at an   Oversight Hearing before the Subcommittee on Administrative Law and Governmental Relations of the Committee on the Judiciary: Judicial Review of Agency Action: HHS Policy of Nonacquiescence, which was  considering legislation to end Secretary Heckler's nonacquiescence policy, Deputy Assistant Attorney General (DAAG) Carolyn Kuhl testified  and  explained the new policy, at Tr. 10:

> Under its new policy, the Social Security Administration acknowledges that, to some extent at least, nationwide uniformity is no longer possible.   The Secretary of Health and Human Services will follow circuit precedent in making final benefit determinations, except in those few cases presenting an issue which HHS, in consultation with the Solicitor General, determines should be relitigated in order to urge reconsideration of a rule of law in a circuit or to seek potential Supreme Court review.  Thus, as it applies to the courts, this policy means that we will follow circuit precedent when the Department of Justice enters the proceedings-- that is in the district court- except where the Justice Department and HHS agree that the issue should be litigated further.. .. Emphasis Added.

130.  In response to inquiry from Members of Congress, DAAG Kuhl provided a list of nonacquiescence cases and Jackson v. Schweiker was not on the list of  "nonacquiescence" cases. See July 25 ,1985 Congressional testimony,  at p. 31-34.

131.   On August 16, 1985, Judge Altimari rendered a Ruppert decision granting the Motion of the defendant.

132.   On August 17, 1985, Judge Altimari scheduled  a Ruppert Chambers conference for September 4, 1985  in response to   plaintiff's complaint that HHS General Counsel Juan del Real, as ratified by DOJ attorneys, was unfairly  implementing retaliatory actions to eliminate his opposing counsel challenging the implementation of his nonacquiescence policy including his Jackson nonacquiescence policy.

133.   On August 20, 1985, HCFA employee Diane Maupai wrote a memo to HCFA employee Kevin Moley suggesting the response to the IMC's counsel's request for a waiver of

34

the enrollment regulations. "Although the law firm does not believe that HCFA has the authority to withdraw the exception once it has been granted, we believe otherwise based upon our review of the regulations." Emphasis Added. Document secured in FOIA request and one of the "mosaic" of documents that the plaintiff seeks to be sealed to protect the CIA's sources and methods within HHS.

134. On August 26, 1985, C. Mc Clain Haddow, "the Acting Administrator of HCFA acceded to IMC's demands, and notified the company that the waiver would be extended to additional counties and monitoring requirements would be loosened." Medicare Health Maintenance Organizations: The International Medical Centers Experience, at p. 5 and 8. Emphasis Added.

135. In September, 1985, President Reagan created a new agency, the Nicaraguan Humanitarian Assistance Office (NHAO), which was to distribute clothing, food, medicine, and transportation vehicles to the contras as authorized by the Congress in their $ 27 million authorization. Reagan versus the Sandistas, the Undeclared War on Nicaragua, Walker, Westview Press, p. 33.

136. On September 4, 1985, prior to the Ruppert conference, Judge Altimari met, ex parte, with a group of attorneys who represented government agencies, one of whom was subsequently identified to Ruppert counsel as a "Washington" attorney from Main Justice in Washington.

137. Upon information and belief, the "Washington" attorney did not provide the truth, the whole truth, and nothing but the truth to Judge Altimari as to the reasons for implementing the then pending "Fraud Against the Government" investigation of Ruppert counsel that was being conducted by the DOJ whereby six Special Agents were contacting his clients ex parte and interrogating his clients in their homes to learn the legal advice that plaintiff was providing

and the legal fees that he was charging in the cases challenging the nonacquiescence policy of HHS General Counsel del Real.

138. Upon information and belief, AUSA Zwany and the "Washington" attorney did not inform Judge Altimari that HHS General Counsel del Real did not reprogram the HHS computer after June 3, 1985 when HHS General Counsel del Real made his decision to acquiesce to the Seventh Circuit Jackson v. Schweiker, 683 F. 2d 1083 (7th Cir. 1982), decision after the sworn July 25, 1985 Congressional testimony that the nonacquiescence policy ended on June 3, 1985 and Members of Congress advised that Jackson was not a nonacquiescence case.

139. Upon information and belief, the "Washington" attorney did not inform Judge Altimari that HHS General Counsel del Real was participating in a "black operation" whereby "unaudited HHS nonacquiescence funds" were being diverted for purposes not intended by the Congress without the knowledge of President Reagan, Vice President Bush, Attorney General Meese, and FBI Director Judge Webster.

140. On September 4, 1985, after meeting ex parte with the government attorneys, Judge Altimari held the Ruppert conference his Chambers in response to plaintiff's complaint that the DOJ and HHS were using improper litigation tactics by instructing six Special Agents to ex parte interrogate the plaintiffs' clients in their homes to learn the legal advise that he was providing and the legal fees that he was charging.

141. At the September 4, 1985 Ruppert Chambers conference, the unnamed "Washington" DOJ attorney did not inform Judge Altimari of the July 25, 1985 sworn Congressional testimony that the nonacquiescence policy of HHS General Counsel del Real was to have ended on June 3, 1985 and that Members of Congress were advised that Jackson was not a nonacquiescence case.

142.  After the September 4, 1985 <u>Ruppert</u>  conference in Judge Altimari's Chambers, upon  information and belief, the "Washington" attorney did <u>not</u> inform Attorney General Edwin Meese that HHS General Counsel del Real was  participating in that  "black operation" that was being conducted  at International Medical Center, Inc.,    through which was  being diverted "unaudited pooled HHS nonacquiescence funds",  and that     HHS General Counsel del Real did <u>not</u> reprogram the HHS computer  when HHS  General Counsel del Real    made    his "acquiescence" decisions,   which affected the pending  <u>Ruppert</u> litigation,    in order that the diversion of "unaudited HHS nonacquiescence funds" would not be diminished.

143.  On September  12, 1985, after the critical September 4, 1985 <u>Ruppert</u> conference the  HHS Office of General Counsel  SSI Director of Litigation sent a memo to the Freeport, New York SSA District Manager regarding the Matthew Stone case and  four other pending cases advising that  prior to responding to any inquiries, contact should be made with the Assistance Programs Branch:

> The Regional Attorney has advised us of several cases pending in the Eastern District of New York, in which all of the claimants are represented in their civil actions by Charles Robert. Frequently, Mr. Robert corresponds directly with the Social Security district office concerning these claimants (i.e. regarding subsequent changes in circumstances and/or changes in SSI payment amounts). <u>Since the action taken may have some impact on individual civil actions, your office should ensure that the case records are properly annotated concerning the pending suits.</u> Contact should be made with the Assistance Program Branch prior to making any changes in payment or responding to Mr. Robert's letters.   Emphasis Added.

144.  On November 4, 1985,  <u>Ruppert</u> counsel  wrote a letter to President Reagan's Chief of Staff Donald Regan and requested that Chief of Staff Regan  review   HHS General Counsel Juan del Real's HHS nonacquiescence policy which resulted in Secretary Heckler <u>not</u> promulgating a <u>Jackson</u> regulation that would be equally applied in all 50 States because Acting

37

SSA Commissioner Mc Steen was not enforcing the HHS regulations equally given her sworn July 25, 1985 Congressional testimony.

145. On December 2, 1985, a payment of 20 million dollars was made to International Medical Center, Inc. Document secured from a FOIA and subject to application to Judge Gershon for sealing of the "mosaic of documents" that reveal the rogue CIA "black operation" that was conducted at IMC in violation of the Boland Amendment.

146. On December 5, 1985, President Reagan's Chief of Staff Donald Regan announced that HHS Secretary Heckler was removed as the HHS Secretary.

147. On December 19, 1985, Acting SSA Commissioner Martha Mc Steen issued a memorandum to all Executive Staff, Change in Acquiescence Policy, explaining changes in the acquiescence policy as explained in her sworn July 25, 1985 Congressional testimony.

148. On December 20, 1985, Acting HCFA Director C. Mc Clain Haddow sent a letter to International Medical Center Chief of Staff Juan del Real responding to a prior inquiry seeking approval of a changed Medicare reimbursement methodology that would be applied to IMC in order for IMC to receive Medicare funds. Document secured from a FOIA and subject to application to Judge Gershon for sealing of the "mosaic of documents" that reveal the rogue CIA "black operation" that was conducted at IMC in violation of the Boland Amendment with the knowledge of CIA assets within HHS.

149. In January, 1986, International Medical Center, Inc. President Miguel Recarey hired former-HHS General Counsel Juan del Real to be IMC's Chief of Staff to join eight other former HHS employees at IMC, including former-Acting HCFA Director C. Mc Clain Haddow. See the April 14, 1988 House Committee on Government Operations report: Medicare Health Maintenance Organizations: The International Medical Centers Experience, at p. 7-10.

150. On January 20, 1986, Clair E. George, the Deputy Director of Operations of the CIA, met with retired Major General Richard Secord to discuss aid to the contras operation. Ex-C.I.A. Official Takes Stand in His Own Defense. N.Y. Times, 8-13-92.

151. On January 20, 1986, Agent Thomas Twetten also attended the meeting with retired Major General Richard Secord that involved discussions of a program that supplied food, clothing, and medical supplies to the contras. <u>Fingerprints Introduced in Trial of Ex-C.I.A. Man</u>. N.Y. Times, 8-7-92.

152. On February 11, 1986, Senior Associate Counsel to the President David B. Waller sent a memorandum to HHS General Counsel Ron Robertson:

> Enclosed please find correspondence received by Don Regan from Charles Robert, Esquire, regarding HHS's policy of non-acquiescence". Mr. Charles complains that as of the date of his letter, Acting Commissioner Martha Mc Steen had failed to respond to his correspondence on this subject. <u>Additionally, he makes allegations of impropriety by the Justice Department in connection with the non-acquiescence policy.</u>
>
> Please advise us of the statutes of this matter and, if appropriate, provide a suggested response to Mr. Robert. Document secured from the DOJ's Snowflake 5391 file in <u>Robert v. Holz.</u> Emphasis Added.

153. On February 14, 1986, ORI Lorretta Busch issued a memo for the "White House-Oliver" file regarding the allegations made by the plaintiff. Document secured from the DOJ's Snowflake 5391 file in <u>Robert v. Holz.</u>

154. On February 21, 1986, HCFA Development Services Division Stephen Weiss wrote to Mr. Gary Baily a memo with a draft and final clarification letter from HCFA Acting Administrator Desmaris, who replaced to Acting Director Haddow, to IMC Chief of Staff Juan del Real regarding IMC reimbursement methodology.

155. On February 21, 1986 HCFA Acting Administrator Desmaris informed HHS Chief of Staff Juan del Real that the reimbursement terms that had been negotiated by Acting Director Haddow had been approved. "Accordingly <u>we do not intend restrict the amounts of the payments ultimately made by an HMO nor do we intend to regulate these payment arrangements.</u>" Emphasis Added. Document secured from a FOIA and subject to application to Judge Gershon

for <u>sealing</u> of the "mosaic of documents" that reveal the rogue CIA "black operation" that was conducted at IMC in violation of the Boland Amendment by CIA assets within the HHS.

156. On March 19, 1986, based on Court authorized search warrants, Inspector General Kusserow seized  records of two IMC affiliates.

157. On March 28, 1996, Regional Administrator George R. Holland advised IMC Chief of Staff Juan del Real that there were serious violations of Medicare regulations. "We'd also like to know what IMC has done to ensure that all other  affiliates comply with Medicare regulations." Document secured in a FOIA request and one of the "mosaic" of documents that the plaintiff seeks to be sealed to protect the CIA's sources and methods within HHS.

158. On April 4, 1996, HCFA Associate Director for Health Maintenance Organizations Frank H. Seubold placed  IMC President Miguel Recarey  on Notice that there were allegations of violations of the regulations and warning of site investigations. "42 CFR 110.904 (b) provides that the Secretary will obtain any information that is considered necessary to determine the issues and may employ site visits, public hearings, or other procedures appropriate to obtain this information." Document secured in a FOIA request and one of the "mosaic" of documents that the plaintiff seeks to be sealed to protect the CIA's sources and methods within HHS.

159. On April 19, 1986, HCFA Associate Director for Health Maintenance Organizations Frank H. Seubold placed  IMC President Miguel Recarey  on Notice that HCFA was initiating an evaluation to determine whether IMC was in compliance with Assurances made to Secretary at the time of Federal qualification. "During DHMO's March 13-15,1986 site visit., IMC made a commitment to improve its internal administrative and managerial systems to better handle the resolution of complaints and to improve  the medical management and administrative relationship between IMC and the affiliated providers with whom it contracts for services."

Document secured in a FOIA request and one of the "mosaic" of documents that the plaintiff

seeks to be sealed to protect the CIA's sources and methods within HHS.

160.    On April 21, 1986, HCFA Associate Director for Health Maintenance

Organizations Frank H. Seubold placed   IMC President Miguel Recarey  on Notice that HCFA

was initiating an evaluation to determine whether its Board of Directors were in compliance with

federal regulations one of whom was the Chief of Staff Juan A. del Real. "IMC's current Board

of Directors does not appear to meet the requirement for one third representation on the policy

making body."  Document secured in a FOIA request and one of the "mosaic" of documents that

the plaintiff seeks to be sealed to protect the CIA's sources and methods within HHS.

161.  On May 15, 1986,  National Security Council aide John Poindexter  presented a

plan to assist  the contras at a meeting of  the National Security Planning Group (NSPG):

> The resistance itself is increasingly desperate as available supplies
> are depleted.  As of May 1, no further medical supplies or clothing
> are available.  By mid-June the outside support the resistance has
> received will have been consumed, and no further significant
> support appears readily available. Iran-Contra Investigation, Joint
> Hearings Before the Select Committee on Secret Military
> Assistance to Iran and the Nicaraguan Opposition and the House
> Select Committee to Investigate Covert Arms Transactions with
> Iran. Appendix to Part I and II,  p. 15. Emphasis Added.

162. Upon information and belief, National Security Council aide John Poindexter  knew

that HHS General Counsel Juan del Real had not reprogrammed the HHS computer when

"acquiescence" decisions were made in order that there could be  diversion of "unaudited pooled

HHS nonacquiescence funds" to International Medical Center, Inc. where IMC President Miguel

Recarey's new Chief of Staff was former-HHS General Counsel Juan del Real.

163. On May 20, 1986, HCFA Associate Director for Health Maintenance Organizations

Frank H. Seubold placed   IMC President Miguel Recarey  on Notice that IMC did not have an

acceptable plan for insolvency as required by the enabling statute. "IMC must now submit within

30 days of the date of this letter, documentation which shows that IMC has made arrangements for insolvency which meet the criteria stated above as evidence that it is meeting the regulatory requirements at 42 CFR 110.,108(a)(i)(iv) and 110.108(a)(3)." Document secured in a FOIA request and one of the "mosaic" of documents that the plaintiff seeks to be sealed to protect the CIA's sources and methods within HHS.

164.  On May 30, 1986, HCFA Administrator William L. Roper placed IMC President Recarey on Notice that IMC was not in compliance with regulations and does not have acceptable ongoing quality assurance program for its health services as required by the Medicare statute. Document secured in a FOIA request and one of the "mosaic" of documents that the plaintiff seeks to be sealed to protect the CIA's sources and methods within HHS.

165.  On June 6, 1986 HCFA Administrator William L. Roper placed IMC President Recarey on Notice that the Inspector General had advised that enrollment practices violated the regulatory standards.   Document secured in a FOIA request and one of the "mosaic" of documents that the plaintiff seeks to be sealed to protect the CIA's sources and methods within HHS.

166.  On August 14, 1986, notwithstanding the sworn July 25, 1985 Congressional testimony of DAAG Kuhl that the nonacquiescence policy had ended on June 3, 1985, and the courageous "just say no" policy of Southern District of New York U.S. Attorney Giuliani not to defend the nonacquiescence policy of HHS General Counsel Juan del Real, the Eastern District of New York Chief of the Civil Division Robert Begleiter advised Manuel A. Rodriguez, Attorney Advisor of the Executive Office for United States Attorneys, Office of Legal Services, that the nonacquiescence policy would continue to be implemented by AUSAs in the Eastern District of New York based on the DOJ attorneys' nonacquiescence policy litigation strategy:

There is, however, no duty on the part of the Department of Health and Human Services nor of the United States District Court for the Eastern District of New York to "acquiesce" or follow a Seventh Circuit decision and an Indiana district court decision applicable to an Indiana-only class in our district. Fundamental principles governing rulings by inferior federal courts dictate that <u>one district need not accept as binding precedent the rulings of another district or of a Court of Appeals outside the district court's circuit, unless an appropriate class is certified</u>. Mr. Robert's argument that it is somehow unlawful for the Secretary to treat Indiana residents differently from New York residents ignores the well accepted possibility of inconsistent decisions among district and circuit courts. <u>As long as the law permits inconsistent rulings, there is no ethical violation in our arguing that Jackson decisions not be followed in the Eastern District of New York</u>. Emphasis Added. Document released from the DOJ Snowflake 5391 file.

167.   On November 10, 1986, the Fifth Circuit decided <u>Hickman v. Bowen</u>, 803 F. 2d 1377 (5th Cir. 1986), and held that HHS General Counsel del Real had been incorrectly interpreting the HHS "loan" regulation, 20 C.F.R. § 416.1103 (f).

168.   SSA Chief Counsel Gonya decided not to appeal the <u>Hickman</u> decision and, contrary to the sworn July 25, 1985 Congressional testimony that the nonacquiescence policy had ended on June 3, 1985,  decided <u>not</u> to acquiesce to the interpretation of the duly promulgated regulation as applied to any other similarly situated SSI recipient.

169.   On January 9, 1987, HCFA issued Publication 70-8074, Office of Hearings and Appeals Staff Guides and Programs Digest, commonly called the "X-17" memo, which advised the ALJs, <u>but not the providers and the fiscal intermediaries</u>,  to apply the duly promulgated skilled nursing home regulatory standard. "The courts have, in fact, been reversing those cases where the decision fails to consider and adequately evaluate the patients' total condition." CCH Medicare and Medicaid Guide paragraph 36,065.

170.   On May 1, 1987,  IMC's contract with HCFA was officially terminated by C. Mc Clain Haddow's successor.   <u>Medicare Health Maintenance Organizations: The International Medical Centers Experience</u>,  at p. 5.

171. On May 5, 1987, the Congress opened the Iran-Contra hearings.

172. On June 16, 1987, HHS Associate Commissioner Sandy Crank advised Eastern District of New York U.S. Attorney Andrew Maloney that HHS had decided not to further pursue administrative sanctions against attorney Charles Robert, but also incorrectly advised U.S. Attorney Maloney that his HHS employees had not contacted the plaintiff's clients:

> At the request of the New York Regional General Counsel staff, we did not contact Mr. Robert, present and former members of his firm, or his present and former clients. ....

> Our decision not to pursue administrative sanctions against Mr. Robert at this time does not mean that we will not investigate if we receive new information he has charged an unauthorized fee, or otherwise violated the law and regulations governing the conduct of representatives practicing before the Social Security Administration. However, absent such new information, we consider the matter closed.

> We have no information that files are maintained on Mr. Robert by the White House, former White House Chief of Staff Donald Regan, or by Margaret Heckler, former Secretary for the Department of Health and Human Services. These files, if they exist, would not be in the control or custody of this office. We have, however, located additional correspondence retained by our Office of Public Inquiries and have enclosed a copy for your information. Emphasis Added.

173. On June 19, 1987, Subcommittee Chairman of the House Committee on Government Operations Jack Brooks asked the Office of Special Investigations of the U.S. General Accounting Office (GAO) to conduct a background investigation of International Medical Center, Inc. April 14, 1988 House Committee on Government Operations report: Medicare Health Maintenance Organizations: The International Medical Centers Experience, at p. 2.

174. On July 23, 1987, the televised Iran-contra hearings began.

175. On August 4, 1987, in a FOIA action seeking the release of a January 24, 1986 document signed by Acting Administrator C. Mc Clain Haddow which had established

44

Medicare rule that had been published in the Federal Register, the Court determined that FOIA Exemption (b)(5) did <u>not</u> apply because the agency had adopted the final agency opinion and therefore FOIA Exemption 5 did not apply. <u>Sutter v. DHHS,</u> cv. 86-1500 (D.C.D.C. 1987) CCH Medicare and Medicaid Guide ¶ 36,615.

176.   On August 14, 1987, <u>Ruppert</u> counsel requested that DAG Arnold Burns review the nonacquiescence policy that was being implemented in the Eastern District to defend the nonacquiescence policy of HHS General Counsel del Real and SSA Chief Counsel Donald Gonya that was <u>contrary</u> to the "just say no" policy that U.S. Attorney Giuliani was implementing in the Southern District of New York by refusing to implement the nonacquiescence policy of HHS General Counsel del Real.

177.   DAG Burns referred Snowflake 5391's August 14, 1987 inquiry to AAG Richard Willard.

178.   On August 27, 1987, AAG Richard Willard advised the plaintiff that the DOJ would not provide legal opinions in response to his review requests. "The Department of Justice generally is not authorized to give legal opinions to private individuals or their representatives such as your self."

179.   On August 27, 1987, AAG Willard sent an E-mail to third parties regarding the plaintiff's complaint regarding the "HHS's Policy of "Non-Acquiescence" and explained the action to be taken "for appropriate handling" of the plaintiff. See hard copy Executive Secretariate Control Data Sheet X 70871149 with the notation THIS DOCUMENT MUST BE DISPOSED OF BY SHREDDING that is in the <u>Robert v. Diefenderfer</u> case file, cv 90-3403 (Wexler, J), that is under <u>seal</u> with the Clerk of the Court.

180.   On August 28, 1987, AUSA M. Lawrence Noyer formally sent a letter to Judge Wexler requesting that the FOIA action <u>Robert v. Holz</u> be promptly discontinued:

It is the defendants' view that Mr. Robert has been provided all files responsive to his Freedom of Information Act (FOIA) request that <u>are not properly withheld on the basis of privilege.</u> Accordingly, we believe that this action should be discontinued promptly.

In paragraphs 1,2, and 3 of his August 14, 1987 letter, Mr. Robert asserts that the Court has not been provided with the "White House,", "Heckler," "Oliver," "Snowflake # 5391" and Justice Department criminal files regarding Mr. Robert "which were to be produced to this Court <u>in camera.</u>" Mr. Robert's statement that these files have been withheld from the Court <u>erroneously assumes that such files exist.</u> Attached as Exhibit A hereto are letters exchanged between this office and the Department of Health and Human Services. <u>These letters which will not be produced to Mr. Robert on the ground of privilege,</u> clearly show that, <u>even assuming such files exist, defendant is not in possession of the files</u> Mr. Robert requests.

With respect to Mr. Robert's demand for Justice Department files alleged to exist concerning him, it should be noted that, even assuming such files exist, they are well beyond the scope of Mr. Robert's FOIA request, which was directly solely to the Department of Heath and Human Services. <u>Finally, with respect to Mr. Robert's suggestion that Judge Altimari was "misled by U.S. Attorneys," and his statement that he has request an investigation by Deputy Attorney General Burns, White House Chief of Staff Baker, and the Judiciary Committee, those matters are well beyond the scope of this action and are more properly addressed in another forum.</u>

It is defendants' position that this action should promptly be discontinued. Plaintiff has been provided with all documents in defendants' possession, custody or control <u>that are responsive to plaintiff's FOIA request and are not privileged.</u> We are prepared to discuss the resolution of this matter at the Court's convenience. Emphasis Added.

181. On September 7, 1987, a Special Agent appeared at a <u>Gordon</u> ALJ hearing with a gun to intimidate or eliminate <u>Ruppert-Stone-Gordon</u> counsel. <u>See</u> the pending <u>Robert III v. HHS</u>, FOIA seeking the documents upon which HHS officials approved the use of the gun by the Special Agent who appeared at the <u>Gordon</u> ALJ hearing at the request of the ALJ.

182.  On October 9, 1987, Judge Wexler rendered his <u>Ruppert v. Bowen</u>, 671 F.Supp. 151 (E.D.N.Y. 1987), decision and held that the Seventh Circuit <u>Jackson v. Schweiker</u> decision did not apply in the Second Circuit, but that  the Fifth Circuit <u>Hickman v. Bowen</u>,   803 F. 2d 1377 (5th Cir. 1986), did apply.

183.  On November 6, 1987, the plaintiff sent  a letter to FBI Director Judge Sessions requesting that he investigate the accuracy of the July 25, 1985 sworn Congressional testimony that the nonacquiescence policy of HHS General Counsel del Real  had ended on June 3, 1985 and the litigation  tactics  of government  attorneys   to eliminate  their   opposing counsel who was challenging the clandestine  implementation of the pre-June 3, 1985 nonacquiescence policy of HHS General Counsel del Real who had become IMC's Chief of Staff for IMC President Miguel Recarey.  See Document 211-31-19  side notation regarding 12-17-87 memo from Chief Jeffrey J. Jamoan released in <u>Robert v. DOJ.</u>

184.  On November 12, 1987, AAG Willard responded to the letter sent to DAG Burns:

> This is in response to your letter of August 14, 1987 to Deputy Attorney General Arnold I. Burns, <u>inasmuch as your letter raises questions concerning the internal affairs of the  Justice Department as well as matters which are currently in litigation, I am not at liberty to discuss the details of these matters with you.</u>
>
> While I cannot discuss the specifics of your allegations of a cover-up within the Department of Justice regarding the policies of the Department of Health and Human Services, or your allegations of misrepresentations by the Department of Justice to federal courts, please <u>rest   assured that the concerns raised by your letter have been given careful scrutiny.</u>   However, I have concluded that your allegations are without foundation.
>
> Finally insofar as you allege that you are the target of a civil and criminal investigation by the Department of Justice, please be advised that the Department of Justice does not comment on such matters. Emphasis Added.

185.  On December 15, 1987, HHS Inspector General Kusserow testified before a House Subcommittee that was investigating International Medical Center, Inc. and explained   that millions of dollars of improper Medicare billing for  expenses could not be accounted for and which extended to IMC's 126  affiliates. "I think that we had some bad people in the HMO's in this particular case."     April 14, 1988 House Committee on Government Operations report: Medicare Health Maintenance Organizations: The International Medical Centers Experience, p. 12-14 and 20.

186.  On December 17, 1987,  FBI Assistant Director of the Criminal Investigative Division Floyd Clarke advised the plaintiff that the November 6, 1987 letter he had sent to FBI Director Judge Sessions  regarding an OMB Administrator  had been  forwarded to the Department of Justice:

> Please be advised that we have forwarded your complaint to the Department of Justice for any action they deem appropriate.  Document 211-0-23 in Robert v. DOJ.

187.  On December 18, 1987, FBI Chief, White Collar Crimes Section, Criminal Investigative Division Jeffrey J. Jamar  sent a memo to FBI Chief, Public Integrity Section, Criminal Division Gerald E. Mc Dowell regarding the  investigation of 1985 decisions made by an OMB Administrator. Document 211-31-4x released in Robert v. DOJ. See also FBI Document 211-31-2 released in Robert v. DOJ.

188.  On December 18, 1987, former-FBI Director and then-CIA Director Judge William Webster gave senior CIA official Alan Fiers a "serious reprimand" for his covert activities funding the contras. Commandos: The CIA and Nicaragua's Contra Rebels. Dillon, Henry Holt and Company, p. 212 and p. 365.

189.  On January 12, 1988,  Judge Wexler held  an in-Chambers    Robert v. Holz FOIA trial  in which the plaintiff, pro se,  was seeking the release of the universe of documents upon which IG Kusserow's "Fraud Against the Government" investigation  of Robert was based.

190.   During   AUSA Noyer's sworn testimony as a witness, he   requested that the plaintiff be exited from the  FOIA trial in order that AUSA Noyer could discuss, ex parte,   one aspect of the case  with Judge Wexler.

191.  Upon the request of the Court, the plaintiff agreed to allow AUSA Noyer to speak, ex parte, with Judge Wexler and exited the Robert v. Holz  FOIA Chambers trial.

192.   Upon information and belief,  pursuant to 5 U.S.C. § 552 (c),   AUSA Noyer informed Judge Wexler that the FOIA documents, if   discussed at the trial,  would provide derivative information to the plaintiff that may reveal classified information to a person not authorized to receive classified information.

193.  Upon information and belief,  AUSA Noyer did not provide  Judge Wexler with the truth, the whole truth, and nothing but the truth regarding the "Fraud Against the Government" investigation of Snowflake 5391 during  AUSA Noyer's  ex parte discussion with the Court. See the Robert v. Holz   sealed transcript.

194.  On January 12, 1988, Judge Wexler rendered his Robert v. Holz  decision  affirming the defendant's decision to withhold documents from the plaintiff and sealed part of the trial Record.

195.  On March 3, 1988, Vice President George  Bush responded to Ruppert counsel's request that the Vice President review the nonacquiescence policy of HHS General Counsel del Real and the Vice President advised Ruppert counsel:

> Thank you for you letter regarding the Health and Human Services policy of non-acquiescence.
>
> We cannot agree more on the importance of ensuring  that government regulations treat all citizens equally. The more the government grows, the greater the possibility that regulations come into conflict.  I strongly support efforts that help every American receive all the benefits rightfully due him or her.

> Since your letter deals with such a specific topic, I have turned it over to
> the people on my staff who handle this issue. They will give this matter
> their attention. Emphasis Added.

196. In March, 1988, Congress appropriated $ 47.9 million for humanitarian aide to the contras. Commandos: The CIA and Nicaragua's Contra Rebels. Dillon, Henry Holt and Company, at p. 367.

197. In April, 1988, the CIA's covert operation, whereby logistical agents had supervised the humanitarian aide that had been provided to the contras, was turned over to the Agency for International Development (AID) and became a public operation. Commandos: The CIA and Nicaragua's Contra Rebels. Dillon, Henry Holt and Company, at p. 228.

198. On April 2, 1988, the plaintiff requested that Southern District of New York U.S. Attorney Giuliani investigate the implementation of the Ruppert-Stone nonacquiescence policy that was being implemented in the Eastern District of New York, but was not being implemented in the Southern District of New York because of U.S. Attorney Giuliani's policy to "just say no" to the implementation of the nonacquiescence policy of HHS General Counsel del Real.

199. On April 7, 1988, Assistant Director Criminal Investigative Division Floyd I. Clarke instructed the New York FBI office to contact the plaintiff:

> A representative of your office should contact Mr. Robert to obtain
> details regarding his allegations and determine    if he has
> information of interest to the Bureau. Prior correspondence to
> which he refers could not be located for review.  Document 63-
> 20470-EBF x 4 released from the "FBI 62-0 file" documents.
> Emphasis Added.

200. On April 14, 1988, House Committee on Government Operations issued its report: Medicare Health Maintenance Organizations: The International Medical Centers Experience which was based in part on IG Kusserow's "mid-1980s" joint FBI-DOJ-HHS task force investigation of International Medical Center, Inc. and the November 15, 1987 sworn Congressional testimony of IG Kusserow. "The committee realizes that the unscrupulous business practices of IMC were the primary cause of the loss of millions of dollars to the Treasury, but we believe that a large factor in the bilking of HCFA was the failure of Federal

officials to hold IMC accountable for its actions and payments." April 14, 1988 House Committee on Government Operations report: <u>Medicare Health Maintenance Organizations: The International Medical Centers Experience</u>, p.14-15. Emphasis Added.

201. The Committee determined that the loss of federal funds was because of the incompetence of federal government employees. "The failure of HCFA to establish financial accountability for IMC payments totaling nearly $ 1 billion over a 6-year period resulted from the incompetence of agency officials." April 14, 1988 House Committee on Government Operations report: <u>Medicare Health Maintenance Organizations: The International Medical Centers Experience</u>, p.17.

202. The Committee recommended better financial controls. "The Committee recognizes that HCFA has learned from the IMC experience, and has improved fiscal accountability, <u>but the committee believes the Medicare program remains vulnerable to improper uses of Federal funds.</u>" April 14, 1988 House Committee on Government Operations report: <u>Medicare Health Maintenance Organizations: The International Medical Centers Experience</u>, p.18. Emphasis Added.

203. On April 25, 1988, Assistant Director Criminal Investigative Division Floyd I. Clarke sent a memo to the FBI New York Field office regarding plaintiff's allegation.

204. On April 28, 1988, U.S. Attorney Rudolph Giuliani referred the plaintiff's complaint that had been made to U.S. Attorney Giuliani regarding the implementation of the "del Real-Meese" nonacquiescence policy, that was contrary to the July 25,1985 sworn Congressional testimony and U.S. Attorney Giuliani's own courageous "just say no" to the implementation of the nonacquiescence policy of HHS General Counsel del Real that he had implemented in the Southern District of New York since 1985, to OPR Director Michael Shaheen.

205.  On May 6, 1988,  Assistant Attorney General John Bolton explained  former-HHS General Counsel Juan del Real's "silent non-acquiescence" policy to the United States Administrative Conference (ACUS) whereby the DOJ continued to defend the nonacquiescence policy after the sworn July 25, 1985 Congressional testimony of DAAG Kuhl that the nonacquiescence policy had ended on June 3, 1985,  and specifically advised the  reasons for the secrecy needs of an attorney/client privilege and Exemption 5 of the FOIA:

> Thus, if a process to identify conflicting court of appeals decisions and to decide whether to acquiesce is to work, it must be protected by attorney-client, and deliberative process privileges.  In particular the work of an acquiescence review board, or of attorneys charged with such functions, would seem to be a virtual textbook example of the reasons why a work product privilege exists.  Similarly, the classic description of the need for a decisional process privilege seem tailor-made for the acquiescence decision process.

> If such new disclosure rules apply to all litigants, not just agencies, then acquiescence theory will have been used to create major, society-wide exceptions to privileges heretofore felt reasonable, with effects on the legal system far exceeding the more modest claims of opponents of nonacquiescence.

> Whatever the ultimate result of the privilege issue, the immediate result of the uncertainty is to discourage agencies from adopting an acquiescence process, or, at least from adopting the type of candid and effective process that comes only with the ability of subordinates and attorneys to give advice in a privileged context.   Emphasis Added. Document secured from FOIA request granted by ACUS.

206.  On June 27, 1988, the plaintiff was interviewed by FBI Agent La Sera  at the FBI's Long Island Office.

207.  On July 6, 1988, a "redacted"  FBI Agent from the Government Fraud Unit wrote a memo to FBI Director Judge Sessions regarding the allegations made by the plaintiff:

> Robert stated that what  the members of the Sub-Committee were told and what the actual policies HHS intended to carry out were different and that the above-named individuals intentionally lied to Congress.

> Robert advised that the allegations of wrongdoing were presented
> to the FBI and in turn to Assistant Attorney General Richard K.
> Willard, who reviewed the matter and found no ethical or legal
> wrongdoing. Document 62-0-95983 released from the "FBI 62-0
> file" documents in <u>Robert v. DOJ.</u>

208.   On July  22, 1988, Assistant  Director Criminal Investigative Division Floyd  I.

Clarke wrote a memo to FBI Director Judge Sessions regarding the allegations made by the

plaintiff regarding the nonacquiescence policy of HHS General Counsel del Real with copies to

Mr. Revell, Mr. Walton, Mr. Daniels, Mr. Ricks, Mr. Potts. and Special Assistants, CID. "The

DOJ advised Mr. Robert on 4/5/88 that they were not taking an action with respect to his

allegations." Document 63-0-84717 secured from "FBI 62-0 file" documents released in <u>Robert</u>

<u>v. DOJ</u>. See also notation on 63-20470.

209.   On July 26, 1988, former-DAG Arnold Burns advised a Senate Judiciary

Committee the reasons for his resignation which included his disagreement with the "Alice in

Wonderland" policies of the DOJ.

210.   On August 1, 1988, Judge Sporkin, the former CIA General  Counsel,   rendered

his unappealed <u>Duggan v. Bowen</u>, 688 F. Supp. 1687 (D.C.D.C. 1988),  and severely criticized

HHS Secretary Bowen's   Medicare  nonacquiescence policy and AG Meese's defense of the

Medicare   nonacquiescence policy:

> Indeed the actions by HHS in the cases presented to me has been
> reprehensible.  <u>It is the most blatant form of stonewalling that an</u>
> <u>agency can engage in and the Secretary should certainly take all</u>
> <u>steps to prevent this from happening again</u>. Id. at 112.  Emphasis
> Added.

211. On August 2, 1988, a "redacted" person wrote a   memo to "Mr. Clarke" which had

attached   letters written by the plaintiff to then-FBI  Assistant Criminal Director Clarke,

Director Michael Shaheen, AAG John Bolton, and AUSA M. Lawrence Noyer,   with a reference

to the   "airtel" written by the June 27, 1988 interviewing FBI agent, and an   analysis of the

nonacquiescence allegation, and "--- redacted--" advised that the Office of Independent Counsel

has no record of Robert." Emphasis Added. Document 62-0-96328  from the "FBI 62-0 file"

released documents.

212.   On August 8, 1988, a redacted FBI official wrote a memo to "Mr. Baker" in

response to correspondence from the plaintiff to  Assistant Criminal Director Floyd Clarke:

> Also, this package seems to indicate that Robert has made
> contentions that HHS funds have been diverted to support of the
> contras.  redacted...

> Could you pleas have someone check further into this situation to
> insure FBI (and Floyd's) interest are protected and we do not, in
> fact, have ... jurisdiction. Exhibit A attached to the Robert v. DOJ
> October 29, 1989 Declaration of Acting  FBI Litigation Director
> Scott Hodes. Emphasis Added.

213.   On August 9, 1988,  the Wall Street Journal reported that federal funds had flowed

through International Medical Center, Inc that was not accounted for by IMC employees.   See

Miami Mystery: Paid to Treat Elderly, IMC Moves in Worlds of Spying and Politics: Medicare

Money Flowed in: Only Mr. Recarey Knows Where It Flowed Next: Congress, "bugs" and Mob.

Wall Street Journal 8-8-1988.

214.   On  August 18, 1988, Mr. Clarke was sent a memo with an "I agree" notation:

> More on the Charles Robert situation. Another package of letters arrived.
> For you on 8.7 and as you can see by my 8/8 routing slip, I requested --- to
> insure our interests are protected. Recommend this be sent to 62-0 file, as
> we did with his last letter.   Exhibit A attached to the Robert v. DOJ
> October 29, 1989 Declaration of Acting  FBI Litigation Director Scott
> Hodes. Emphasis Added.

215.   On October 10, 1988, the plaintiff wrote to Attorney General Thornburgh  and

requested a review of the July 25, 1985 sworn Congressional testimony that the nonacquiescence

policy of HHS General Counsel del Real had ended on June 3, 1985 and that the sworn July 25,

1985  Congressional  testimony  was  not  accurate   Congressional  testimony  because  the

nonacquiescence of HHS General Counsel del Real did not end on June 3,  1985.

216.  On December 12, 1988, <u>Georgetown Hospital v. Bowen</u>, 104 S. Ct. 428 (1988) was decided in which Justices Kennedy and Scalia explained that the Judiciary is to defer to the Secretary's properly promulgated regulations, but <u>not</u> defer to the Secretary's appellate counsel's legal interpretations of duly promulgated regulations.

217.  On January 9, 1989, DOJ Office of Professional Responsibility (OPR)  OPR Director Michael Shaheen sent a letter to <u>Ruppert-Stone-Gordon</u> counsel  explaining the "Thornburgh-Giuliani" policy:

> Because this Office reviews allegations of misconduct brought against Department of Justice employees, your letter to Assistant United States Attorney Charles B. La Bella, dated April 2, 1988, was referred to us by U.S. Attorney Rudolph A. Giuliani for consideration.  Your letter to Mr. LaBella dealt with the alleged misconduct of several Assistant United States Attorneys and other Department of Justice employees by virtue of their continued assertion of "non-acquiescence' in defending Health and Human Services cases brought by Supplemental Security Income recipients.
>
> <u>Although, in our view, the position adopted by Mr. Giuliani's office -- not to defend the Secretary of Health and Human Service's non-acquiescence policy -- is the correct legal formulation</u>, we do not accept the proposition that espousal of non-acquiescence by other U.S. Attorneys' offices constitutes misconduct.  We believe that non-acquiescence is a defense <u>that can be supported by a good faith argument for an extension, modification, or reversal of existing law</u> and, thus, does not violate the Code of Professional Responsibility. Emphasis added.

218.  On February 2, 1989, AAG John Bolton informed the plaintiff that his investigation of the investigation of AAG Willard's investigation of the  plaintiff's allegation that DOJ attorneys were defending the pre-June 3, 1985 nonacquiescence policy of HHS General Counsel del Real contrary to the  sworn July 25, 1985 Congressional testimony of DAAG Kuhl that the nonacquiescence policy had ended on June 3, 1985:

> In response to your letter to the Attorney General dated October 10, 1988, please be advised that the Department of Justice <u>will continue to adhere to its established procedures for reviewing arguments to be made on behalf of the Government in pending suits.</u>  Your letter also recommends that the

Department establish a new unit to enforce the news Medicare statue, but no such organizational change appears warranted at this time. You also request that we investigate at least nine individuals in regard to the "nonacquiescence" policy, but such an investigation would be an undertaking that I do not believe is warranted by the information you presented in your letter. Emphasis Added.

219. On March 29, 1989, the Second Circuit rendered its <u>Ruppert v. Bowen</u>, 871 F. 2d 1172, 1177 (2d Cir. 1989) decision and commented on <u>Ruppert</u> counsel's allegation that the federal government had been making "Janus-faced" representations to the Court.

Appellants' counsel would have the SSA apply circuit court decisions nationally. He goes so far as to detect unethical conduct on the part of government counsel, who, he argues, mislead us with what he calls "Janus-faced," see <u>Hidalgo v. Bowen</u>, 822 F. 2d 294, 299 (2d Cir. 1987), statements regarding the SSA's acquiescence policy. See Estreicher & Revesz, <u>Nonacquiescence by Federal Administrative Agencies</u>, 98 Yale L.J. 679, 681 (1989) (defining "agency nonacquiescence" as the "selective refusal of administrative agencies to conduct their internal proceedings consistently with adverse rulings of the courts of appeals"). <u>The SSA evidently considers itself bound only by the decisions of the Supreme Court and by those decisions of the applicable circuit court to which the SSA has not announced its objections.</u> See Department of Health and Human Services, HHS News (June 3, 1985) (Press release); Office of Hearings and Appeals Staff Guides and Programs Digest Bulletin No. III-I, at 4 (Aug 22, 1986); Ruppert, 671 F. Supp. at 169-71; Estreicher & Revesz, supra, 98 Yale L.J. at 694-99. Although appellants suggest that SSA has promised to apply circuit court decisions nationally and argue that it should be required to do so, <u>we affirm Judge Wexler's determination that the SSA's acquiescence policy applies only within circuits</u>. Emphasis Added.

220. On March 29, 1989, the plaintiff was interviewed by FBI Agent Allison and Robert Lonsterth at the Office of Independent Counsel Lawrence Walsh and informed the IC's staff of his knowledge of the implementation the pre-June 3, 1985 nonacquiescence policy of HHS General Counsel Juan del Real that was contrary to the sworn July 25, 1985 Congressional testimony of DAAG Kuhl that the nonacquiescence policy had ended, which resulted in the diversion of "unaudited pooled HHS nonacquiescence funds" being diverted through IMC. Inc and onto the contras in violation of the Boland Amendment, but <u>without</u> the knowledge of the

Congress, President Reagan, Vice President Bush, Attorney General Meese, FBI Director Webster, and Secretaries Heckler and Bowen.

221.  On May 16, 1989, Acting Solicitor General William C. Bryson determined that the Second Circuit's  Ruppert decision would not be appealed as there would be "no rehearing en banc no certiorari "

222.  On July 24, 1989, an Airtel from a redacted  DOJ official   to FBI Director Judge Sessions was hand-carried to a redacted FBI official in Room 7142. Document  62-0-95983 (19) secured from the "FBI 62-0 file" documents released in Robert v. DOJ.

223.  On August 2, 1989, a redacted FBI employee wrote an unclassified  memo to Mr. Clarke regarding the letters that Robert had written to  OPR Director Michael Shaheen, AAG John Bolton, and AUSA M. Lawrence Noyer and noted:

> It is Robert's contention that HHS is following a policy of "non-acquiescence" with regard to ignoring Federal Court decisions insofar as they pertain to paying benefits to his clients.  He claims that certain HHS and DOJ officials advised a subcommittee of Congress in 1985 that this policy was being abandoned when, in fact, it is still being followed. His contentions have been presented to AAG Willard; Mike Shaheen; USA, SDNY; and AUSA, EDNY, each of who has rejected he contentions as without merit. Document secured from the "FBI 62-0 file" documents. Emphasis Added.

224.  On January 11, 1990, contrary to the July 25, 1985 sworn Congressional testimony of DAAG Kuhl  that the nonacquiescence policy ended on June 3, 1985, Secretary Sullivan promulgated a   new nonacquiescence policy that incorporated the  pre-June 3, 1985 nonacquiescence policies of  HHS General Counsel del Real. Application of the Circuit court law. 20 C.F.R. § 416.1485. 55 F.R. 1020 (January 11, 1990).

225.  On March 29, 1990, Judge Stewart decided Hinton v. Sullivan, 737 F. Supp. 232 (S.D.N.Y. 1990), reversed Secretary Sullivan's Appeals Council's decision,   and ordered a contempt of court  award  of $ 1000 to be paid by the defendant to the plaintiff   because the defendant intentionally made    "phony" entries of income into the HHS computer. "Yet, this "phony" income amount was actually charge as income to the plaintiff." Id. at 235.

226.  Notwithstanding  the sworn July 25, 1985 Congressional testimony and the $ 1000 Hinton contempt order, SSA General Counsel Gonya  did not appeal Judge Stewart's Hinton decision, did not present the issue of the inputting of "phony" income to the Policy and Review Committee, and did not  end the policy and practice of claims representatives  imputing "phony" income into the HHS computer, with the result  that the inputting of "phony" income has continued unabated through 2002     because Executive Branch attorneys, including the DOJ attorneys who are revealed in the FOIA withheld documents,  have all ratified      HHS General Counsel del Real's post-June 3, 1985 decision     not to reprogram the HHS computer when the HHS and SSA General Counsel make their  "acquiescence" decisions.

227.  The plaintiff filed a FOIA with the Office of the Solicitor General to determine the basis for the Solicitor General defending a  Ruppert nonacquiescence policy which was  contrary to the sworn July 25, 1985 Congressional testimony of DAAG Kuhl that the nonacquiescence policy had ended on June  3, 1985.

228.  On or about June 15, 1990, SSA Chief Counsel Donald Gonya informed the SSA Commissioner King that the Second Circuit had incorrectly decided Ruppert and that the Ruppert holding should only be applied in the Second Circuit States of New York, Connecticut, and Vermont.

229.  On June 15, 1990, SSA Commissioner King filed for publication Catalog of Federal Domestic Assistance Programs Nos. 13,802 the "Evaluation of a Rental Subsidy as In-Kind Income for Supplemental Security Income Benefit Calculation Purposes."  See Social Security Acquiescence Ruling 90-2(2),  the "Ruppert Acquiescence Ruling."

230.   On June 21, 1990,   Solicitor General Starr's FOIA Officer Shapiro advised the plaintiff that the FOIA requested documents would not be released. "Because release of memos of this kind would tend to chill the deliberative process within this Office in future cases, I have,

in accordance with the standard Office practice, determined that these memos should not be released." Emphasis Added.

231.  On July 16, 1990,  Secretary Sullivan   issued his <u>Ruppert</u> Acquiescence Ruling, determined that <u>Ruppert</u> had been incorrectly decided,      determined <u>not</u> to extend the <u>Jackson</u> regulation to the Second Circuit States, and   discussed the limited  fact pattern in which parents were the  landlords of their  adult disabled children. See 55 FR 28947 (July 16, 1990).

232.  On August 20, 1990, the Secretary published a Notice of Proposed Rule Making (NPRM) to amend the SSI in-kind income regulation to redefine an "in-kind income" loan which would  moot the Second Circuit <u>Ruppert</u>  and Fifth Circuit <u>Hickman</u>  decisions. 55 FR 33922 (August 20, 1990).

233.  On May 4, 1991,  in an informal conversation at an ABA meeting, the plaintiff advised Solicitor General Ken Starr  that the nonacquiescence policy of HHS General Counsel del Real continued to be  implemented contrary to the sworn July 25, 1985 Congressional testimony of DAAG Kuhl  and hand-delivered a series of documents for Solicitor General Starr to review.

234.  On May 15, 1991, Acting Deputy  Solicitor General  Wright  advised plaintiff that Solicitor General Starr had reviewed the May 3, 1991 letter hand delivered to Solicitor General Starr with  the series of documents and      cited  the  plaintiff Secretary Sullivan's new nonacquiescence regulation, <u>Application of circuit law</u>,   20 C.F.R.§ 416.1485, adopted on January 11, 1990 (55. F.R. 1020).

235.  On May 15, 1991, the Ninth Circuit decided <u>Ceguerra v. Sullivan</u>, 933 F.2d 735 (9th Cir. 1990),  cited to <u>Hickman</u> and <u>Ruppert</u>, and chastised Secretary Sullivan:

> <u>The Secretary's position, if accepted, allows the government to gain</u>
> <u>unjustly from its own wrongdoing.</u> Ceguerra was eligible for SSI benefits

and had been receiving them until the Secretary wrongfully terminated them in 1982....

According to the government, Ceguerra could have arranged to accept her loan in cash instead of in kind. If Napolean Ceguerra had given his mother a check for $ 250 each month, and idf she had immediately endosed the check back to her son to cover her share of the household expenses, the Secretary would have regarded the arrangement as a valid loan of cash. We do not believe the Congress intended that eligible recipients of SSI benefits be forced to conduct such a senseless charade. Moreover, when an administrative agency interprets its governing statute to require such an absurd result, we owe that interpretation no deference. Id. at 741-742

236.  SSA General Counsel Gonya and Solicitor General Starr decided  not to appeal the Ninth Circuit's Ceguerra decision.

237.  On September 3, 1991, Secretary Sullivan's ALJ rendered a Ruppert II ALJ decision which by application of the Second Circuit Ruppert standards, reversed the original denial of benefits.

238.  HHS Secretary Sullivan's Office of General Counsel determined not to appeal the Ruppert II ALJ decision and, pursuant to HHS General Counsel del Real's pre-June 3, 1985 nonacquiescence policy, not to apply that Ruppert II standard in other similarly situated  cases or reprogram the HHS computer to apply the Ruppert II legal standard in any other case.

239.  On October 23, 1991, President George Bush issued Executive Order 12778 instructing Executive Branch officials to eliminate unnecessary litigation.

240.  On February 5, 1992, the Second Circuit Stone IV Agreement to apply the Ruppert-Hickman standards to the Stone fact and to publish the "Stone IV" standard  standards,  to be applied to other similarly situated SSI recipients,  was signed by Eastern District of New York AUSA Nancy Miller.

241.  On April 6, 1992, the Attorney General's Advisory Committee by Action Memorandum recommended that the there be a DOJ policy change to devolve settlement

decisions to local District DOJ offices and increase a United States Attorney's authority to <u>settle</u> cases <u>without</u> "main Justice" approval to $1, 000,000.

242.  On April 9, 1992, Assistant Attorney General Stuart Gerson, who was then in charge of the DOJ Civil Division, defended the DOJ's aggressive approach challenging private attorneys' failure to take action when they had actual knowledge that savings and loans were not providing accurate information to government agencies regarding income and resources, in a New York Times Op Ed column, <u>When Lawyers Must Disclose</u>:

> Because accountants have a well-understood duty of public disclosure, cases against them have occasioned little dispute. However, cases against lawyers have been far more controversial. Notwithstanding the alarums and excursions on the status of the attorney-client privilege and ethical rules, <u>the Government's approach does not represent any novel theory of radical departure from traditional standards. No lawyer is ever entitled to misrepresent facts, knowingly offer false evidence or otherwise further a fraud</u>. Emphasis Added.

243.  On April 20, 1992, AAG Stuart Gerson sent a memo to Attorney General William Barr recommending disapproval of the proposed policy to increase a United States Attorney's authority to <u>settle</u> cases without "main Justice" approval to $1, 000,000:

> My main concern in the delegation of settlement authority is the need to <u>maintain consistency in settlements, and, through preventive lawyering, national client quality assurance</u>. Moreover, given that case responsibility for civil proceedings is still (and should remain) a matter of delegation, <u>settlements require a useful degree of centralized approval authority</u>. Emphasis Added. Document released in <u>Ruppert Counsel III v. DOJ</u>, cv 95-1794 (Wexler, J).

244.  In the April 20, 1992, AAG Stuart Gerson recommended disapproval of proposed further devolvement of authority to settle litigation because the DOJ had an internal tracking system that could coordinate settlements within all of the Offices of the United States Attorneys. "Indeed, in 1990 we established a Settlement Tracking System within the Civil Division to ensure all settlement actions are processed quickly."

245. On July 23, 1992, the trial of CIA Deputy Director Clair E. George was delayed because of issues regarding classified information. "The last-minute hearings involved proposed substitutions by the U.S. Intelligence agencies for various secret materials and the recent discovery of two boxes of CIA documents under a desk at the spy agency." Contra Trial Delayed. Newsday, 7/23/-92.

246. On July 24, 1992, the trial  CIA Deputy Director Clair E. George, who was  in charge of the CIA's clandestine operations around the  world,   heard  the government's evidence as to  whether  the Deputy Director had lied to Members of Congress.  U.S. Opens Case Against Ex-Spy In Contra Affair: Former C.I. A. Official Is Portrayed as a Liar. N.Y.Times, 7-25-92.

247. On July 31, 1992, CIA Deputy Director George admitted that he had helped run a covert program in Nicaragua after ordered not to do so by the Congress. Ex-CIA Official Admits He Defied Congress's Orders. N.Y.Times, 8-1-92.

248. On August 11, 1992, IC Walsh prosecutor Craig Gillen questioned CIA employee David Gries as to the knowledge of CIA official Clair E. George and was told that the CIA was "compartmented so that one CIA employee may not know the actions of another CIA employee. In a secret intelligence agency, where you have compartmentation, you cannot put together a story immediately." Ex-Agent's Defense Opens, Haltingly. N.Y. Times. 8-12-92, p A 20.

249. On August 12, 1992, it was reported that IC Walsh had made Attorney General Meese a target of the Iran-contra investigation and his attorney Nathan Lewin denied any wrongdoing. "Mr. Meese knows that he committed no criminal offense, and is confident that the investigation, when finally concluded, will clear him and others who have unjustifiably been tarnished by speculation in the media." Meese Is Termed a Subject in Iran-Contra Inquiry. N.Y. Times, 8-13-92.

250.   On August 12, 1992, a Congressional investigation determined that Justice Department officials stole the Inslaw computer software "Promis" program. "The investigation

report, adopted today by the House Judiciary Committee found that Attorneys General Edwin

Meese 3d and Dick Thornburgh blocked Congressional inquiries into the dispute involving the

computer company, Inslaw, which made the software at issue." Report Says Justice Department

Stole Computer Software in 80's. N.Y.Times, 8-12-92.

251.  On September 8, 1992, Secretary Sullivan advised the public in the Federal Register

that he had  rescinded the "Hickman Acquiescence Ruling" and reinstated the in-kind loan policy

as established in the 1978 SSR 78-26. 57 FR 40918 and 40919 (September 8, 1992).

252.  On October 22, 1992, AAG Stuart Gerson wrote a Memorandum to AG Barr and

stated objection to    the further   devolvement of settlement decisions away from DOJ at main

Washington:

> The Advisory Committee proposal is simply not warranted and is
> self-defeating if the Department intends to maintain oversight and
> consistency in civil settlements and quality of national agency
> activity. Emphasis Added. Document released in Ruppert Counsel
> III v. DOJ, cv  95-1794 (Wexler, J).

253.  On  December 24, 1992, President Bush issued a Grant of Executive Clemency for

Executive Branch officials subject to indictment  by Independent Counsel Walsh. "Some may

argue that this decision will prevent full disclosure of some new key fact to the American people.

That is not true. "    The Iran-Contra Scandal: The Declassified History. Kornbluh and Byrne,

The New Press,  p. 374.

254.  On May 4, 1993,   Robert v. Diefenderfer, cv 90-3403  (Wexler, J), was settled

when  the plaintiff agreed to a dismissal, without prejudice,  after  AUSA Arthur Hui, on behalf

of then-Eastern District of New York U.S. Attorney Mary Jo White,  filed in a  sealed file the

FOIA withheld documents, including the Executive Secretariate E-mail of AAG Richard Willard.

255.  On July 21, 1993, AUSA Bruce Nims advised Ruppert-Stone-Gordon counsel  that

he had reviewed the Appeals Council Banks' Gordon  decision, Judge Spatt's Gordon decision,

and determined that there was no basis for a remand and that the government's <u>Gordon</u> appeal would proceed:

> <u>I have again reviewed</u> the final Appeals Council decision in the <u>Gordon</u> case, giving appropriate attention and weight to the statements and allegations that you have made in your various communications to the undersigned. <u>It is the opinion of this office</u> that the Secretary's decision in this case complies with the law of the Circuit, the statute, and the regulations promulgated thereunder, including AR 90-2 (2). In short, there is absolutely no basis for remand in this case and defendant will move for judgment on the pleadings. Emphasis Added.

256.   On August 3, 1993, the plaintiff filed a FOIA request seeking the release of the "FOIA Docket Number 91-11 AA regarding International Medical Center, Inc. qui tam documents" and "all of the qui tam documents in the FOIA file regarding International Medical Center, Inc."

257.   On November 12, 1993, Judge Spatt reversed Secretary Sullivan's <u>Gordon</u> decision and applied the Second Circuit <u>Ruppert</u> "actual economic benefit" standard:

> The Court concludes that the Secretary's determination of the plaintiff's actual economic benefit <u>was based on an erroneous legal standard.</u> Applying the standard enunciated by the Court in <u>Ruppert</u> in the Second Circuit, the Court finds that the plaintiff's rental subsidy was not actually available to her and , therefore, the in-kind support for rent should be disregarded for the months of June, 1986 until November, 1990. Emphasis Added.

258.   SSA Chief Counsel Gonya and Eastern District of New York AUSA Bruce Nims appealed Judge Spatt's <u>Gordon</u> decision.

259.   Plaintiff Gordon's counsel suggested a <u>settlement</u> of <u>Gordon</u> in order that there would not be an appeal to the Second Circuit whereby AG Reno would agree to a remand of the <u>Gordon</u> decision rather than perfect the appeal Judge Spatt's <u>Gordon</u> decision, in order to provide the new HHS Secretary Shalala with an opportunity to review Secretary Sullivan's Appeals Council Administrative Law Judge Banks' <u>Gordon</u> decision given the Second Circuit February 5,

1992 Stone IV agreement signed by AUSA Nancy Miller, and the fact that the same legal standards were not being applied by SSA claims representatives because the HHS and SSA computer was never reprogrammed when HHS General Counsel del Real and SSA Chief Counsel Gonya made "acquiescence" decisions after the sworn July 25, 1985 Congressional testimony and the Office of General Counsel decision not to appeal the September 3, 1991 Ruppert II decision.

260. On January 10, 1994, the plaintiff inquired as to the status of the "IMC qui tam" documents FOIA request.

261. On January 24, 1994, the plaintiff had an informal conversation with Solicitor General Days and advised him that DOJ attorneys were continuing to implement the clandestine nonacquiescence policy of HHS General Counsel del Real that was to have ended on June 3, 1985 and that as Solicitor General of the United States he should review Attorney General Reno's and Secretary Shalala's nonacquiescence policy being implemented by local U.S. Attorneys.

262. On February 23, 1994, at the Second Circuit Gordon pre-argument conference, Gordon counsel and AUSA Bruce Nims stipulated that the government's appeal of Judge Spatt's Gordon decision would be withdrawn to provide Secretary Shalala with an opportunity to review the decision to appeal Judge Spatt's Gordon decision reversing AAJ Banks' Gordon decision with the condition that AUSA Nims could reinstate the Gordon appeal Shalala by April 1, 1994 if so instructed by Secretary.

263. On March 30, 1994, AUSA Nims notified the Second Circuit that the Gordon appeal should be reinstated.

264. Upon information and belief, pursuant to the clandestine implementation of the pre-June 3, 1985 nonacquiescence policy of former-HHS General Counsel del Real, Secretary

65

Shalala never reviewed the standard applied by AAJ Banks when he rendered his February 25, 1992 Gordon III decision,  never reviewed the February 5, 1992 Second Circuit Stone IV agreement signed by Eastern District of New York AUSA Nancy Miller, and never applied the standards applied when the unappealed  September 3, 1991 Ruppert II decision was rendered.

265.  On April 9, 1994, the nationwide class action suit Ford v. Afpel was filed and the plaintiffs alleged that Secretary Shalala was violating their  due process rights   because Secretary Shalala was sending  SSI Notices denying and reducing benefits which  did not explain the standards  applied to terminate or deny benefits.

266.  On January 10, 1995, the plaintiff requested that Counsel to the President Abner Mikva review the nonacquiescence policy being implemented  by the DOJ and HHS in Gordon v. Shalala.

267.  On January 17, 1995, Counsel to the President Mikva advised Gordon counsel that he had referred the inquiry to the DOJ. "Because the Department of Justice is representing the defendants in the pending litigation, we have forwarded your correspondence and enclosures to the Associate Attorney General for any appropriate action."

268.  On April 6, 1995, Attorney General Reno amended the regulations regarding the Authority to Compromise or Close Cases and to File Suits and Claims and at Section 2 (b) required documented  reasons for settlement of cases. "The referral memorandum should contain a detailed description of the matter, the United States Attorney's recommendation, the agency's recommendation where applicable, and a full statement of the reasons thereof."  60 F.R. 17457 (April 6, 1995).

269.  On April 20, 1995, President Clinton published Executive Order 12958, and established rules regarding classified information which included a 10 year rule whereby the

burden is on the government to prove that a "classified" document determination was appropriate. 60 FR 19825 (April 20, 1995). See <u>Duration of Classification</u> Section 1.6 (d)(1).

270.   On May 22, 1995, the Second Circuit rendered its <u>Gordon</u> decision,  reversed Judge Spatt's decision,   and explained in detail the <u>Gordon</u> standard that Secretary Shalala   was applying  in computing SSI benefits of adult children who resided in the homes of their non-legally responsible parents. <u>Gordon v. Shalala</u>,  55 F. 3d 101 (2d Cir. 1995).

271.   On August 22, 2995,  plaintiff Gordon filed a petition for a writ of certiorari.

272.   On October 30, 1995,  the plaintiff filed a FOIA  request with the National Archives to secure the release of the  "FBI Agent Allison" documents which had been in the  custody of FBI Agent Allison  at the March 29, 1989 meeting with Snowflake 5391 regarding the allegation of the "unaudited pooled HHS nonacquiescence funds" had been   diverted   to the contras through IMC in violation of the Boland Amendment.

273.   On December 18, 1995, Judge Bucklo  explained  in the unappealed <u>Beckless II v. Chater</u>, 909 F.   Supp. 575 (N.D.Ill. 1998), how AG Reno's interpretation of <u>Jackson</u> had eviscerated the regulation even within the Seventh Circuit States:

> The defendant <u>essentially argues that the "Exception" applicable to the Seventh Circuit should be read out of section 416.1130(b).</u> Opposition def. br. 10. By its words, the exception does not confine a business arrangement to payment of full rent charged by a landlord. <u>Rather, a business arrangement exists "when the amount of monthly rent required to be paid equals or exceeds the presumed maximum value ...."</u> <u>Id.</u> at n. 4, p. 580. Emphasis Added.

274.   In February, 1996, Solicitor General Days   and AAG Frank Hunger filed the government's Brief in Opposition to the <u>Gordon</u> petition for a writ of certiorari and defended the implementation of nonacquiescence policy of HHS General Counsel del Real as implemented by Secretary Bowen, Secretary Sullivan, Secretary Shalala,   HHS Regional Counsel Blum, and AUSA Bruce  Nims.

275. In General Days' <u>Gordon</u> Brief, contrary to the sworn July 25, 1985 Congressional testimony of DAAG Kuhl and the "Thornburgh-Giuliani" policy, as explained in the January 9, 1989 letter from OPR Counsel Michael Shaheen to <u>Gordon</u> counsel, Solicitor General Days, with AAG Frank Hunger and attorneys Barbara C. Biddle and Edward Himmelfarb on the Brief, advised Justices of the Supreme Court of the basis their defense of the HHS nonacquiescence policy:

> Petitioner's discussion of the Acquiescence Ruling manifests a misunderstanding of such rulings. In issuing those rulings, the Commissioner has chosen to acquiesce in adverse court of appeals decisions within the respective circuits, instead of seeking review of those decisions in this Court. That practice, however, in now way obligates the Commissioner to change her administration of the Act in cases involving other litigants in *other* circuits that have not rejected her legal position on a particular issue. See e.g., <u>United States v. Mendoza</u>, 464 U.S. 154. Id. at n. 4, p. 12. Emphasis not added.

276. On April 18, 1996, the Supreme Court denied the petition for a writ of certiorari. <u>Gordon v. Shalala</u>, 116 S.Ct. 1317 (1996).

277. On May 10, 1996, in <u>Mines v. HHS</u>, AUSA Bruce Nims explained to Judge Johnson how HHS General Counsel Juan del Real's Medicare appeal process was implemented for the nationwide <u>Sarrassat</u> class members. <u>See</u> <u>Sarrassat, et. al. v. Sullivan</u> CCH Medicare and Medicaid Guide, paragraph 38,504, aff'd 961 F. 2d 917 (9th Cir. 1992).

278. On May 22, 1997, contrary to the representation made to the Justices of the Supreme Court by Solicitor General Days and AAG Hunger in the government's <u>Gordon</u> Brief in opposition to the <u>Gordon</u> petition for a writ of certiorari, Social Security Administration General Counsel Arthur Fried, testified before the Committee on Judiciary Subcommittee on Commercial and Administrative Law and advised that the Social Security Administration that the nonacquiescence policy had ended in June, 1985:

> When a U.S. Circuit Court of Appeals publishes a decision on a claim for Social Security Benefits, or Supplemental Security Income (SSI)

payments, and that decision conflicts with our national policy, we either issue an Acquiescence Ruling, change our national policy, or, in rare cases, seek review by the Supreme Court.   We never ignore these decisions. This has been our policy since 1985, and the publication of our current policies in regulations in 1990 essentially ended criticism by the courts in this area. Emphasis Added.

279.   In the spring of 1998,   prior to implementation of the statutory prohibition of Legal Services Corporations litigating class action suits, AG Reno's U.S. Attorney for the Northern District of Texas entered into an unreported Joint Stipulation of Settlement to apply the Jackson regulatory standard, 20 C.F.R. § 416.1130 (b) to Texas SSI class members, but not to SSI recipients who resided in the other Fifth Circuit States of Mississippi and Louisiana.   Diaz v. Chater, c.v. 95-cv-1817-X.

280.   On April 6, 1998 filed a complaint with AG Reno that the sworn May 22, 1997 Congressional testimony of SSA General Counsel Fried was false Congressional testimony because the nonacquiescence policy did not end in June, 1985 and the same legal standards were not applied at all levels of SSA adjudication or equally in all 50 States.

281.   On August 11, 1998, former FBI Director-CIA Director Judge Webster wrote an Op Ed column in the New York Times and noted the importance of the Attorney General having the ability to keep the secrets of the CIA sources and methods without judicial review:

> Intrusive Congressional demands to see such reports and recommendations could keep decision makers from seeking the best available advice.
>
> Such tensions are not new.  But in my own experience as Director of the F.B.I. and as Director of Central Intelligence, conflicts were resolved amicably and without seeking court intervention.
>
> For example, in 1990, the Senate Select Committee on Intelligence asked the C.I.A. to provide it with information about individuals involved in a covert action in Latin America.  In most cases, the agency would provide information to the Select Committee, confident that it would not be disclosed if the committee was satisfied that no wrongdoing had occurred.

> But we did not want to divulge the names of these people because we
> considered them protected sources. We offered to disclose the information
> only to the committee's chairman and vice chairman.
>
> The panel still wasn't satisfied, and in the end, it voted to cancel financing
> for the covert action. We weren't happy with this decision, but were
> satisfied that we avoided public disclosure of the sources' names.
> Emphasis Added.

282. On December 21, 1998, notwithstanding his sworn May 22, 1997 Congressional testimony of SSA General Counsel Fried that the nonacquiescence policy had ended in June, 1985 and that the same legal standards were applied at all levels of SSA adjudication, SSA General Counsel Fried decided not to heed Judge   Payne's admonition in his unappealed Ragsdale v. Apfel, 999 F. Supp. 814 (E. D. Vir. 1998), decision which applied the   Jackson standard to  Virginia SSI recipients:

> This litigation need never have occurred. And, that it did, reflects poorly
> on the Agency which elected not to seek review of the decisions issued by
> the Second or Seventh Circuits and then put the Ragsdales to the needless
> task of establishing the obvious: that the decisions of the Second and
> Seventh Circuit were correct. Citizens residing in the Fourth Circuit
> should not be required needlessly to incur costs and fees in order to
> achieve the rights already enjoyed by those individuals residing in the
> Second and Seventh Circuit. It may be that the Agency's conduct is not
> sanctionable  in this case, but it must be hoped that the  Agency will not, in
> the future, pursue the course which it has followed here. Id. at 824.
> Emphasis Added.

283. On March 9, 1999, the plaintiff by telephone discussed the pending "IMC qui tam" FOIA  appeal with FOIA Officer  Cirrincione and the importance of the pending HHS FOIA because of the use of FOIA Exemption 3 by the National Archives when rendering its decision not to release the "FBI Agent Allison" documents which was at issue in the then pending Snowflake 5391 v. The National Archives, the DOJ, the HHS, and the SSA.

284. On March 10, 1999, the FOIA Director Cirrincione  rejected the request for an expedited decision:

The FOIA requires that the agency expedite processing of a request when the requester demonstrates a compelling need or in other cases determined by the agency. (5 U.S.C. 552 (a)(6)(E). To demonstrate a compelling need, the FOIA requester must show that; 1) the failure to obtain the requested information could reasonably be expected to pose and imminent threat to the life or physical safety of an individual or 2) he/she is primarily engaged in disseminating information and there is an urgency to inform the public concerning actual or alleged Federal Government activity. In Your February 26, 1999 letter you failed to demonstrate a compelling need. Therefore, I am denying your request for expedited processing. Emphasis Added.

285. On March 12, 1999, the plaintiff appealed the March 10, 1999 decision.

286. On June 8, 1999, Judge Wexler granted Attorney General Reno's Motion to sever the defendants in Snowflake 5391 v. The National Archives, the DOJ, the HHS, and the SSA.

287. On June 9, 1999, the Director Rosario Cirrincione, Director, FOI/Privacy Acts Division rendered his decision as to the February 16, 1999 FOIA request for the "IMC qui tam" and "Kusserow" documents and advised the plaintiff:

No such determination has been made by the Office of Inspector General (OIG).

According to staff in the OIG, all IMC-related records that might be considered in determining whether or not to make such a decision are considered part of open and on-going investigations. Therefore, I have denied in their entirety all IMC-related records under the provisions of (b)(7)(A) of the FOIA. Exemption (b)(7)(A) permits the withholding of investigative records complied by law enforcement purposes when disclosure could reasonably be expected to interfere with enforcement proceedings. Emphasis Added.

288. On June 28, 1999, pursuant to Judge Wexler's June 8, 1999 Snowflake 5391 v. The National Archives, the DOJ, the HHS, and the SSA decision, the plaintiff filed Robert v. HHS, cv 99-3648 (Spatt, J), and sought two sets of documents:

A.   The DHHS IMC qui tam documents
B.   The IMC Kusserow IMC documents

289. On June 28, 1999, the plaintiff appealed FOIA Director Cirrincione's   June 9, 1999 HHS FOIA decision and provided the HHS FOIA Appeal Officer with a courtesy copy of the Robert v. HHS FOIA complaint.

290. On September 29, 1999, Judge Sifton decided Ford v. Apfel, 87 F. Supp 2d 163 (E.D.N.Y. 1999), and   discussed the plight of a nationwide class of millions of   legally defenseless SSI recipients residing in all 50 States who did not know the reasons why their benefits were denied or reduced by citing to Gray Panthers v. Schweiker, 652F. 2d 146, 168-169 (D.C. Cir. 1980):

> Unless a persons is adequately informed of the reasons for the denial of a legal interest, a hearing serves no purpose-- and resembles more a scene from Kafka than a constitutional process. Without notice of the specific reasons... a claimant is reduced to guessing what evidence can or should be submitted in response and driven to responding to every possible argument ... at the risk of missing the critical one altogether... .Id. at 178. Emphasis Added.

291. On October 1, 1999, in Robert v. HHS AUSA Mahoney filed the Declaration of Special Agent (criminal investigator) Edward N. Le Faiver, Jr.  in Robert v. HHS to explain her client's knowledge of the FOIA requested IMC documents.

292. On October 1, 1999, in Robert v. HHS AUSA Mahoney filed the Declaration of HHS Deputy Assistant Inspector General (DIGI), Office of Inspector General (OIG), Department of Health and Human Services (HHS), Cesario   in Robert v. HHS to explain her client's knowledge of the FOIA requested IMC documents.

293. On October 29, 1999, the plaintiff filed a responding Affidavit in Robert v. HHS, and placed AUSA Mahoney on Notice of the details of the FOIA request for the "IMC qui tam" documents and the "IG Kusserow" documents, provided a copy of SSA General Counsel Fried's sworn May 22, 1997 Congressional testimony,  and restated the settlement offer.

294. On November 2, 1999, AG Reno's Deputy Chief for the Public Integrity Section Joann Farrington advised <u>Ruppert-Stone-Gordon</u> counsel that he had not provided sufficient evidence to merit a formal investigation of the plaintiff's complaint that DOJ attorneys were implementing the pre-June 3, 1985 nonacquiescence policy of HHS General Counsel del Real contrary to the sworn July 25, 1985 Congressional testimony of DAAG Kuhl and the sworn May 22, 1997 Congressional testimony of SSA General Counsel Fried.:

> As you may know, in order for us to commence a criminal investigation, there must be sufficient factual evidence for us to conclude that a federal crime may have been committed within the statute of limitations. Because your materials do not contain such information, we regret we are unable to be of assistance to you.

295. On November 16, 1999, FOIA Director Cirrincione rendered a decision affirming the denial of the release of the FOIA requested HHS documents:

> This is in response to your February 16, 1999 Freedom of Information Act (FOIA) request to this Department seeking any International Medical Center (IMC) qui tam documents. In your February 16, 1999 request you referenced my letter dated October 16, 1988 in which I released to you the entire FOIA appeals labeled 91-11AA. I released this file to you because in your February 23, 19988 letter you specifically requested "FOIA Docket No. 91-11AA International Medical Center, Inc. qui tam documents." As a follow up my October 16, 1988 release you submitted your February 16, 1999 request for a more diligent search or in the alternative, a de novo request for any IMC qui tam documents.
>
> <u>The Office of the Inspector General has informed this office that there diligent search for IMC qui tam documents located no responsive documents</u>.
>
> While we believe that an adequate search of appropriate files was conducted for the records you requested, you have a right to appeal this finding that no records exist which would be responsive to your request. Emphasis Added.

296. In a March 28, 2000, letter Snowflake 5391 labeled and explicitly identified each FOIA request in order that there would be no confusion given the pending <u>Robert v. HHS</u> action: 1) the "Cirrincione IMC" documents, 2) the "Cesario IMC" documents, 3), the "Le Faiver"

documents, 4) the "IMC mid-1980s" report documents, 5) the "1999 IMC investigation" documents, 6) the "Gordon gun" documents, and 7) the "Gordon ALJ" documents.

297.  On May 1, 2000, Justice Thomas issued the <u>Christensen v. Harris County</u> decision and explained that the "law" to be applied by an Executive Branch agency are the duly promulgated regulations and not the interpretations of the regulations by Executive Branch counsel. "To defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create de facto a new regulation." <u>Christensen v. Harris County</u>, 120 S. Ct. 1655 (2000).

298.  On May 22, 2000, Judge Wexler rendered his decision in   <u>Robert v. National Archives</u>, denying the plaintiff's request for the release of the "FBI Agent Allison" documents that the National Archives had withheld pursuant to FOIA Exemption 3.

299.  The plaintiff appealed Judge Wexler's <u>Robert v. National Archives</u> decision.

300.  On December 12, 2000, the  Supreme Court Court issued its <u>Bush v. Gore</u> decision based on the common sense equal protection standard that when the government makes the same adjudication, it must apply the same legal standard. "The problem inheres in the absence of specific standards to ensure its equal application. " <u>Bush v. Gore</u>, 121 S. Ct. 525 (2000).

301.   On January 12, 2001, the Second Circuit affirmed Judge Wexler's <u>Robert v. National Archives</u> decision. 2001 WL 28277, and dismissed the appeal based on the Court's deference to the Executive Branch representation that no documents were being withheld by the National Archives, in a decision that is not to be published.

302.  On February 28, 2001, Judge Mishler rendered his <u>Robert v. HHS</u>, cv 99-3648, decision and dismissed the FOIA action, without prejudice, because the plaintiff had not exhausted his administrative remedies  because the  plaintiff appealed HHS FOIA Director

Cirrincione's June 9, 1999 decision on the same date that he filed the FOIA action <u>Robert v.</u> <u>HHS</u>.

303. On March 30, 2001, Judge Mishler decided <u>Robert v. DOJ</u> and dismissed the complaint.

304. The plaintiff appealed Judge Mishler's <u>Robert v. DOJ</u> decision

305. On June 18, 2001, President George W. Bush  issued his <u>Olmstead</u> Executive Order 13217 in which he directed the SSA Commissioner to reevaluate all policies as they impact on  disabled persons ability to reside in the community.   "The United States seeks to ensure that America's community-based programs effectively foster independence and participation in the community for Americans with disabilities."  66 F.R. 33155-33156 (June 21, 2001).

306. On June 20, 2001, the plaintiff filed <u>Robert III v. DOJ</u>, cv 01-4198 (Gershon, J), seeking the release of the "Recarey extradition" documents.

307. On August 9, 2001, Assistant Secretary for Public Affairs Kevin Keane advised the requestor that the  decision denying plaintiff's request for the "IMC Kusserow" documents and the "Gordon" documents  had been affirmed:

> This responds to your June 25, 2001 Freedom of Information Act (FOIA) appeal.  You question the adequacy of the search for records, documented in the May 29, 2001 response to your initial (November 22, 1999) and subsequent inquiries.  You requested:  1.   International Medical Center, Incorporated (IMC) documents relied upon by Rosario Cirrincione in making his November 16, 1999, decision; 2.  IMC documents relied upon by Michael Cesario in signing a declaration; 3. IMC documents relied upon by Edward N. Lefaiver in signing a declaration; 4.  IMC Mid-1980's reports; 5.  1999 IMC investigation documents; 6.  Gordon gun documents; and, 7.  Gordon Administrative Law Judge (ALJ) documents.  Among various statements in your letter you assert there is no explanation of a search for "Gordon gun" and "Gordon ALJ" documents, and suggest some documents may have been transferred by the Department's employees to the Central Intelligence

Agency (CIA).   You also ask that we consider preparing a Vaughn Index.

As you know, the Office of the Inspector General (OIG) reported locating no directly responsive records upon its initial search, but did locate 628 pages of related records which were released (with redactions) with the May 29, 2001 response.  The second review located no responsive records.

The OIG reports that its official files concerning the mid-1980's IMC inquiry were purged and destroyed in accordance with the applicable records retention schedule.  We've considered your request for a Vaughn Index but we believe this is neither required or appropriate at this time. Emphasis Added.

308.  On August 28, 2001, the plaintiff  advised Assistant Secretary for Public Affairs Kevin Keane that he  did not receive the 628 pages allegedly sent  and made *de novo* requests for a copy of the 628  documents, including the  redacted documents, that were alleged to have been released to the plaintiff.

309.  On August 31, 2001, at the Robert III v. DOJ Magistrate's conference, the plaintiff renewed the offer of settlement.

310.  On September 7, 2001, the plaintiff received the cited  628 pages which contained  a set of sensitive   HHS documents,   for which some  of the documents the   plaintiff has subsequently applied to Judge Gershon in Robert III v. DOJ   to  seal because when   taken together  with other documents  there is now a  "mosaic of documents" that track a money trail of the rogue CIA "black operation" through International Medical Center, Inc. and which reveal the CIA's sources and methods within HHS and DOJ to violate the Boland Amendment.

311.  On September 12, 2001, the plaintiff filed Robert III v. HHS. cv-01-6114 (Gleeson, J), seeking the release of the "IMC Kusserow" documents and the "Gordon gun" FOIA requested documents.

312.  In the <u>Robert III v. HHS</u>  service letter of the  complaint upon Attorney General Ashcroft and HHS Secretary Thompson,      Snowflake 5391  renewed the  ongoing offer of <u>settlement</u> that had been rejected by AUSA Mahoney and AUSA Riley, upon information and belief without the knowledge of their clients, in order to protect the CIA sources and methods within the DOJ, the FBI, the HHS, and the SSA.

313.  On January 25, 2002, the Second Circuit  issued a Summary Order and affirmed Judge Mishler's <u>Robert v DOJ</u> and rejected the appellant's request  that the Court  apply the First Amendment/Privacy Act balancing standard established in <u>Bartnicki v. Vopper,</u> 121 S. Ct. 1752 (2001). "We have considered Robert's new argument, find <u>Bartnicki</u> to be inapposite to the circumstances of this case, and decline the invitation to remand." <u>Id.</u> slip opinion 3.

314.  On January 16, 2002, <u>Ruppert-Stone-Gordon</u> counsel formally requested AAG Michael Chertoff to reopen AG Reno's Office of Public  Integrity Deputy Chief Farrington's investigation of <u>Ruppert-Stone-Gordon</u> counsel's  complaint that the sworn May 22, 1997 Congressional testimony of SSA General Counsel Fried and the sworn July 25, 1985 Congressional testimony of DAAG Kuhl contained  false Congressional testimony  based on Solicitor General Days and AAG Frank Hunger's February, 1996 <u>Gordon</u> Brief submitted to the Supreme Court.

315.  In February 2002, Admiral John Poindexter became the Director of the Information Awareness Office of the Defense Department.

316.  Upon information and belief, if asked, Admiral Poindexter will  inform AG Ashcroft whether HHS General Counsel del Real had been a CIA asset who diverted "unaudited pooled HHS nonacquiescence funds" through International Medical Center, Inc. and on to the contras because the HHS computer was never reprogrammed when "acquiescence" decisions were made.

317. On February 15, 2002, the plaintiff filed <u>Robert IV v. DOJ</u>, cv 02-1101 (Garaufis, J), seeking the release of the "Charles Robert criminal investigative file" documents, the "Shaheen law enforcement" documents, the "Ruppert" documents, the "Stone" documents, and the "Gordon" documents,  to prove to AG Ashcroft that he had lost "command and control" over DOJ litigation decisions because he  <u>not</u> been provided the truth, the whole truth, and <u>nothing but the truth</u>, by his own DOJ attorneys who are disciples of HHS General Counsel del Real and CIA assets within the DOJ who continued to defend the clandestine implementation of the nonacquiescence policy of HHS General Counsel del Real from 1985- 2002,  which DAAG Kuhl had testified in her sworn July 25, 1985 Congressional testimony had ended on June 3, 1985.

318. As of the date of this complaint, AAG Chertoff has <u>not</u> docketed the request for an investigation of the accuracy of the sworn May 22, 1997  and July 25, 1985 Congressional testimony based on documentary evidence that included the February, 1996 <u>Gordon</u> Brief submitted by Solicitor General Days and AAG Frank Hunger to the United States Supreme Court.

319. The plaintiff also seeks the release of the documents to  cite to federal court judges and Congressional Oversight Committees that  Executive Branch officials and attorneys have <u>not</u> provided the truth, the whole truth, and <u>nothing but the truth</u>  in pleadings filed in litigation challenging  the clandestine implementation of the  post-June 3, 1985  nonacquiescence of HHS General Counsel Juan del Real based on the Executive Branch officials' and attorneys' <u>good faith</u> belief that FOIA Exemption 3 provides a license to Executive Branch officials and attorneys <u>not</u> to tell the truth, the whole truth, and <u>nothing but the truth</u> to federal court judges  in order to protect the CIA's "sources and methods" involved in a  rogue domestic  IMC "black operation" which had been implemented  with CIA assets within  the FBI, HHS,  and the DOJ.  <u>See</u>

78

Reining in the Glomar Response: Reducing CIA abuse of the Freedom of Information Act, Comment, 27 U.C. Davis 219 (1993).

320.  The plaintiff intends to cite to the documents in a series of cases that will seek to roll back the April 9, 1994 Ford v. Apfel nationwide class certification of SSI recipients to June 3, 1985 because of the implementation of an HHS clandestine nonacquiescence policy and a "fraud upon the court" by the DOJ attorneys filing pleadings in HHS cases that did not provide federal court judges with the truth, the whole truth, and nothing but the truth about the clandestine implementation of the post-June 3, 1985 nonacquiescence policy of HHS General Counsel del Real.    See Judge Sifton's determination in Ford v. Apfel, 87 F. Supp. 2d 163 (E.D.N.Y. 1999), that the due process rights of six million legally defenseless aged, blind, and disabled SSI recipients were violated because the SSI Notices denying benefits did not explain the standard applied or cite to the applicable law, the Supreme Court's explanation of a "clandestine policy" as explained in City of New York v. Bowen, 106 S.Ct. 2023, and the Supreme Court's explanation of the "fraud upon the court" standard as explained in Chambers v. Nasco, 111 S. Ct. 2123 (1991).

321.  Because of the sensitivity of the "Top Secret" documents being withheld by the CIA pursuant to FOIA Exemption 3 that will reveal details of the rogue domestic "black operation" to divert "unaudited pooled HHS nonacquiescence funds" through IMC that was implemented without the knowledge of President Reagan or the Congress, the plaintiff has renewed the ongoing settlement offer to AG Ashcroft that all of the FOIA actions would be withdrawn if AG Reno would agree to implement the "acquiescence" policy as detailed in the July 25, 1985 sworn Congressional testimony as if the July 25, 1985 sworn Congressional testimony contained the truth, the whole truth, and the nothing but the truth that the nonacquiescence policy of HHS General Counsel Juan del Real had ended on June 3, 1985, and from June 3, 1985 forward the

79

federal government would implement an "acquiescence" policy as per the sworn July 25, 1985 Congressional testimony of Acting SSA Commissioner Mc Steen, DAAG Kuhl, and SSA Chief Counsel Gonya and the sworn May 22, 1997 Congressional testimony of SSA General Counsel Arthur Fried.

322.  As of the date of this complaint, AG Ashcroft has not rejected the renewed offer of settlement made whereby all of the FOIA actions and FOIA requests would be withdrawn if AG Ashcroft agreed to inform his client agencies, HHS and SSA, that the nonacquiescence policy ended on June 3, 1985 as per the sworn July 25, 1985 Congressional testimony of DAAG Kuhl.

323.  The plaintiff seeks the good offices of the Court to mediate a settlement of this FOIA action and the other FOIA action by the plaintiff withdrawing all FOIA actions and FOIA requests in consideration of AG Ashcroft instructing his client agencies, HHS and SSA, to implement the acquiescence policy as explained by DAAG Kuhl in her sworn July 25, 1985 Congressional testimony which would result in the end of the implementation of the nonacquiescence policy of HHS General Counsel del Real from 1985-2002 whereby AG Ashcroft fulfills his Article II, Section 3 duty to "take Care that the Laws be faithfully executed" by the application of the Bush v. Gore, 121 S. Ct. 525  (2000), equal protection standard whereby government officials apply the same legal standard when making the same adjudication.

WHEREFORE, the plaintiff respectfully requests the following relief:

a) Declare that this is a case of great importance, takes precedence on the docket over all cases, and is assigned a hearing date at the earliest practicable date and expedited in every way;

b) Direct the defendant to file a Vaughn Index itemizing each document withheld and provide a detailed explanation how a FOIA Exemptions has been applied to each document that has been withheld;

c) Order the defendant to produce the documents for the Court's *in camera* review;

d) Consider mediating the plaintiff's proposed settlement offer whereby all of the FOIA actions and FOIA requests would be withdrawn if AG Ashcroft instructed his client agencies to implement the acquiescence policy as per the July 25, 1985 sworn Congressional testimony of DAAG Kuhl that the nonacquiescence policy ended on June 3, 1985;

e) Hold a hearing at which the plaintiff has an opportunity to establish the need to secure the requested documents in order to carry the heavy evidentiary burden to prove that his First Amendment right to have access to the Courts was breached by CIA assets within the DOJ and HHS in order that the Court can apply the Bartnicki v. Vopper, Christopher v. Harbury, New York State Bar Association v. Reno First Amendment standards to any of the government's FOIA Exemption privacy or CIA sources and methods defenses;

f) Make a written Finding, pursuant to 5 U.S.C. § 552 a (4) (F), that the withholding of the documents was not reasonable and that the circumstances surrounding the withholding raise questions whether agency personnel acted arbitrarily or capriciously with respect to the withholding, and appoint a Special Counsel to initiate a proceeding to determine whether disciplinary action is warranted against the officer or employee who was primarily responsible for the withholding of documents.

g) Direct the defendant to cease withholding from the plaintiff the documents requested, together with other evidence considered by the defendant in making such decision and determination, and order defendant to release the withheld documents to the plaintiff;

h) Award attorney's fees to plaintiff;

i) Award such relief from the Court deems appropriate.

Dated:   December 31, 2002

KASSOFF ROBERT, LERNER & ROBERT, ESQS.
BY:  CHARLES ROBERT, ESQ.
100 Merrick Road-Suite 508W
Rockville Centre, New York 11570
Phone:  (516)  766-7700

82